Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
Angelia Alioto-Grace (SBN 206899)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA CRANE SCHOOL, INC., on behalf of itself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC, ALPHABET, INC., XXVI HOLDINGS, INC., APPLE, INC., TIM COOK, SUNDAR PICHAI, and ERIC SCHMIDT,<br><br>Defendants. | Case No:  4:21-cv-10001 HSG<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §§ 1 AND 2)**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1.     This is a private antitrust suit brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. 15, 26) for actual and potential damages and injunctive relief caused by reason of and made necessary by the Defendants' past, present and substantially threatening continuation of violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. 1, 2).

2.     The Defendants Apple and Google agreed that Apple would not compete in the search business in competition with Google.

3.      In exchange for Apple's commitment not to compete in the search business in competition with Google, Google agreed to share its profits from the search business with Apple and, in addition, to pay Apple extra billions of dollars.

4.      Apple agreed to assist Google in building its search business for their mutual benefit.

5.      For Google to be able to generate sufficient billions of dollars to pay to Apple, Apple agreed that Google would be the only search engine automatically included in all of Apple's devices.

6.      Apple's agreement to include Google as the initial search engine on all of Apple's devices gives Google a substantial and unfair anticompetitive advantage over other search providers, actual and potential, including Yahoo!, DuckDuckGo, Bing, and others.

7.      Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and non-Google favored advertisers.

8.      These agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Officers and Chairmen of Apple and Google.

9.      The architects of the combination during the early 2000's were Steve Jobs, the CEO and Chairman of Apple, and Eric Schmidt, the CEO and Chairman of Google.

10.     More recently, the continued combination to eliminate competition between Apple and Google for the search business has been re-affirmed by Tim Cook, the CEO of Apple, and Sundar Pichai, CEO and Chairman of Google.

11.     The meetings between the CEOs and Chairmen of Apple and Google were clandestine to fraudulently conceal the agreement not to compete in the search business.

12.     The Plaintiffs do not know when the agreement was originally formed but allege that it began with Messrs. Jobs and Schmidt and that it has continued in force under Messrs. Cook and Pichai.

13.     Some of the secret meetings have been photographed and taped by bystanders who chanced to notice the conspirators meeting together.

14.     These meetings were undertaken to promote the shared vision that Apple and Google would act in effect as one company that was merged without merging.  Apple and Google invented the word "co-opetitive" to describe their unlawful combination and conspiracy.

15.     These CEOs and Chairmen knew and understood that their agreements were illegal under the Antitrust Laws of the United States.  The CEOs and Chairmen had been advised that their agreement to divide the market would violate the antitrust laws.

16.     Notwithstanding the advice of their counsel, the CEOs and Chairmen of Apple and Google insisted on going forward with the agreement in contumacious disregard of the law, thereby waiving any privilege that otherwise would attach to communications with their counsel.

17.     The overall purpose of the Defendants' agreement was to eliminate the potential competition of Apple entering the search business.

18.     In furtherance of the unlawful agreement, the Defendants engaged in the following acts and means, among others, to ensure the success of the agreement:

a.     secret meetings between the CEOs;

b.     profit-pooling;

c.     payment of billions of dollars every year by Google to Apple;

d.     automatic inclusion of Google search on Apple devices, to the exclusion of other search companies, and non-Google favored advertisers;

e.     agreement that Apple would not compete;

f.      the recognition and agreement that the more Google made the more Apple made; and

g.     elimination of Apple as a potential competitor in the search business.

19.     More than half (50%) of Google's search business was conducted through use of Apple devices.

20.     Because more than half of Google's search business was conducted through Apple devices, Apple was a major potential threat to Google, and that threat was designated by Google as "Code Red."

21.     Google paid billions of dollars to Apple and agreed to share its profits with Apple to eliminate the threat and fear of Apple as a competitor.

22.     Google viewed the aspect of Apple as a potential competitor to be  "Code Red."

23.     If Apple became a competitor in the search business, Google would have lost half of its business.

24.     Google, as of September 2020, controlled 94% of the mobile search engine U.S. market share.

25.     Google, as of September 2020, controlled 82% of computer search engine U.S. market share.

26.     For the last 10 years, from 2009 to 2019, Google increased its control of the search engine U.S. market share from 80% to 88%.

27.     Google charges higher prices to advertisers than would otherwise be the case in the absence of the Google-Apple agreement.

28.     By reason of the agreement between Apple and Google, the prices, the production, the innovation, and the quality of the search business has been substantially, adversely, and anticompetitively affected.

29.     In addition to the potential and actual damages suffered by reason of the conspiracy, the Plaintiff and the class also charge under Section 16 of the Clayton Act that the illegal payments by Google to Apple and the illegal profit sharing, and all payments by Google to Apple in furtherance of the agreement, must be disgorged under principles of equity on the grounds that these wrongdoers cannot be allowed or permitted to profit from their own wrongdoing.

30.     Because of the fraudulent nature of the clandestine meetings of these CEOs and Chairmen of Apple and Google, and because of the secrecy of their agreements, the exact amounts and times of the payments, rebates, and profit sharing that Google made to Apple are alleged on information and belief.

31.     In any one year, Google paid Apple more than $1 billion.

32.     In any one year, Google paid Apple more than $3 billion.

33.     In any one year, Google paid Apple more than $6 billion.

34.     In any one year, Google paid Apple more than $9 billion.

35.     In any one year, Google paid Apple more than $10 billion.

36.     In any one year, Google paid Apple more than $12 billion.

37.     In any one year, Google paid Apple more than $12 billion.

38.     In any one year, Google paid Apple more than $15 billion.

39.     From 2005 up to and including the time of the filing of this complaint, Google paid Apple more than $50 billion not to compete in the search business.

40.     Google paid Apple to stay out of the search business.

41.     Apple accepted the payments from Google and stayed out of the search business.

42.     Apple promoted Google in the search business as against other search providers and non-favored advertisers.

43.      Apple and Google have the motive, the opportunity by their meetings, and the ability to control the search business, to share in the profits, and to eliminate the potential competition of Apple.

44.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

45.     Plaintiff CALIFORNIA CRANE SCHOOL, INC. and the putative class have paid more to Defendant Google to place their ads on Google's search than they would have paid in a competitive market within the United States, especially if Apple had entered the search business and competed with Google.

46.     The Court has personal jurisdiction over the Defendants because all Defendants are domiciled and are found within the United States, and venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Defendants transact business and are found within this District.

47.     Defendants Google and Apple have engaged in, and their activities have affected substantially the interstate and foreign trade and commerce of the United States. Google and Apple provide a range of products and services that are intentionally marketed, distributed, sold, and offered to consumers throughout the fifty states and across state lines

and in foreign countries.  The restraints alleged in this Complaint affect and are a burden on the free and open trade between and among the States of the United States and the trade and commerce between and among the United States and foreign nations.

48.     Plaintiff, CALIFORNIA CRANE SCHOOL, INC., is a corporation organized under the laws of the state of California.  Plaintiff has directly paid Google for the placement of advertising on Google search.  Plaintiff has for many years paid rates for advertising on Google that have been inflated by the Defendants' conspiracy.

49.     Defendant Google, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Mountain View, California. Google is a subsidiary of Defendant XXVI Holdings Inc., which is a subsidiary of Defendant Alphabet Inc. Defendant Alphabet Inc. is a publicly traded company that is incorporated and existing under the laws of the State of Delaware.  Its principal executive offices are in Mountain View, California. (Unless separately noted, Defendants Google, XXVI Holdings Inc. and Alphabet will hereinafter and above be collectively referred to as "Google".)

50.     Defendant Apple, Inc. (hereinafter and above referred to as "Apple") is a corporation organized and existing under the laws of the State of Delaware.  It is headquartered in Cupertino, California.

51.     Defendant Tim Cook is the current CEO of Apple, Inc.  Defendant Cook personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Defendant Pichai of Google. Defendant Cook's acts were authorized and ratified by Apple, and Defendant Cook was paid bonuses for the anticompetitive success of the agreements with Google.  The board of directors of both Google and Apple knew of these agreements and understood their purpose, intent and motive, and approved and ratified them.

52.     Defendant Sundar Pichai is the current CEO of Defendant Alphabet Inc. and of Defendant Google LLC.  Defendant Pichai personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Defendant Cook of Apple. Defendant Pichai's acts were authorized and ratified by Google, and Defendant Pichai was paid bonuses for the anticompetitive success of the agreements with Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent and motive, and approved and ratified them.

53.     Defendant Eric Schmidt is the former CEO and Chairman of Google. Defendant Schmidt personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterparts Steve Jobs and Defendant Cook of Apple. Defendant Schmidt's acts were authorized and ratified by Google, and Defendant Schmidt was paid bonuses for the anticompetitive success of the agreements with Apple.  Defendant Schmidt served on the Board of Directors of both Google and Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent and motive, and approved of and ratified them.

54.     Various persons, partnerships, firms, and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.

55.     Apple and Google have achieved their size by multiple acquisitions of competitors and potential competitors, all of which have violated Section 7 of the Clayton Antitrust Act (15 U.S.C. §18).

56.     Since 2000, Appl\e has acquired more than 120 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.  *FTC vs. Procter & Gamble Co.*, 386 U.S. 568 (1967)

57.     Since 2000, Google has acquired more than 247 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.

58.     Apple and Google are two of the largest companies in the world.

59.     Apple and Google have abused their size by their agreement not to compete, by their profit sharing, by their preferential search settings, by their exclusion of non-favored Google advertisers and by their suppression of actual and potential search providers.

60.     Apple and Google have abused their size by engaging in anticompetitive conduct, some of which has resulted in fines in the billions of dollars.

61.     Although "Mere size * * * is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly * * * size carries with it the opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift*, 286 U.S. 106 (1932).  Also see *United States v. Aluminum Co. of American*,  148 F.2d 416, at 430 (2d Cir 1945), Judge Learned Hand by virtue of the certificate of the Supreme Court, acting under the authority of the Supreme Court; *United States v. Paramount Pictures*, 334 U.S. 141, 174 (1948).

62.     Both Apple and Google have abused their size and have utilized their size in the past for unlawful purposes, using unlawful means to achieve unlawful objectives.

63.     Again, both Apple and Google have abused their size by engaging in unlawful acquisitions under Section 7 of the Clayton Antitrust Act and have been found to have engaged in anticompetitive conduct.  Indeed, Google has been fined billions of dollars for having abused its size by engaging in anticompetitive conduct.

64.     The current CEO of Defendant Alphabet Inc. is Sundar Pichai, who is also the CEO of Google LLC.  The current CEO of Defendant Apple Inc. is Tim Cook.

65.     Plaintiff brings this action under Federal Rule of Civil Procedure Rule 23, on behalf of itself and a class defined as follows:

> All consumers and businesses who paid Google to place advertising on Google search in the United States since January 1, 2005, to and including class certification herein. Excluded from the class are Defendants, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, and any judge, justice or judicial officer presiding over this matter and members of their immediate family and any jurors.

66.     Class treatment is warranted in this case because:

(a) The number of potential Plaintiff Class members is so numerous that joinder of all members is impracticable.  There are millions of persons and entities throughout the United States who have paid Google to place advertising on Google search.

(b) There are questions of law or fact common to the class.  The questions of law or fact are common to the class since Defendants have agreed that Apple will not compete with Google for search business, a *per se* violation of the antitrust laws, and other competitive conduct in furtherance of the conspiracy not to compete. By reason of the violation, Plaintiff and the class have been injured and damaged and are substantially threatened with future common injury and damage.

(c) <u>The claims or defenses of the representative parties are typical of the claims or defenses of the class</u>.  Every member of the class shares the determination that a division of the market by reason of an agreement not to compete is a *per se* violation of the antitrust laws and has deprived the class of competition in the placement of advertising on search.  Except as to the amount of damages, all other questions of law and fact are common to the class and predominate over any questions affecting only individual members of the class.

(d) <u>The representative parties will fairly and adequately protect the interests of the class</u>.  Plaintiff has engaged counsel experienced and competent in litigation of this type who will adequately represent the class.

67.     Defendant Google is one of the wealthiest companies in the world, with a market value of over $1 trillion and annual revenue exceeding $180 billion.

68.     As of November 30, 2021, Google shareholder equity is $244.57 billion, and its market cap is $1.892 trillion.

69.     Google's revenue for 2021 through September is $239.21 billion and its net income is $70.62 billion.

70.     Google's CEO Sundar Pichai was awarded a $242 million pay package after taking control of Alphabet in 2019.  Pichai has earned nearly $1 billion in stock grants over the last five years.

71.     Google has achieved pre-eminent power in search. When asked to name Google's biggest strength in search, Google's former CEO explained: "Scale is the key. We just have so much scale in terms of the data we can bring to bear."  By using profit sharing agreements to lock up scale for itself and deny it to others, Google has unlawfully built and

maintains its search monopoly, so long as Apple abides by the agreement not to compete against Google.

72.     Apple is an American technology company that specializes in consumer electronics, software and online services.

73.     Apple was founded in 1976 and is now the largest information technology company by revenue in the United States, totaling $274.5 billion in 2020.

74.     Since January 2021, Apple has been the world's most valuable company. As of November 30, 2021, Apple shareholder equity is $63.09 billion, and its market cap is $2.712 trillion.

75.     Apple's revenue so far in 2021 through September is $365.82 billion and its net income is $94.68 billion.

76.      In 2020, Apple CEO Tim Cook was paid a $14.8 million salary and had $281 million worth of stock options that vested; in 2021 Cook was given 5 million Apple shares worth about $750 million.

77.     Apple devices account for roughly 60 percent of mobile device usage in the United States.

78.     Apple's Mac OS (operating system) accounts for approximately 25 percent of total computer usage in the United States.

79.     Apple and Google are currently worth more than $4.5 trillion combined.

80.     Apple and Google believe they are one company: "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo".  Their general counsel described the reality of their combination as "coopetition."

81.     Google's primary source of income is advertising revenue generated from its Google search engine.

82.     Google uses consumer search and consumer information to sell advertising.

83.     When a consumer uses Google, the consumer provides personal information and attention to the delivered searched page in exchange for search results. Google monetizes the consumer's information and attention by selling ads.

84.     As of September 2020, Google controlled 94 percent of the mobile search engine U.S. market share.  As of September 2020, Google controlled 82 percent of the computer search engine U.S. market share.



These charts are taken from Figures 7 and 8 found at paragraph 93 in the United States Government's first amended complaint against Google dated January 15, 2021, filed in the District of Columbia, 1:20-cv-03010-APM.

85.     Google's next closest competitor in 2020 commanded less than 2% of the mobile search market.  All the competitors, Yahoo!, Bing, DuckDuckGo, and others have less than 7% of the market compared to Google's almost 94%.



This chart is taken from Figures 6 found at paragraph 92 in the United States Government's first amended complaint against Google dated January 15, 2021, filed in the District of Columbia, 1:20-cv-03010-APM.

86.     In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

87.     Scale is of critical importance to competition among general search engines for consumers and search advertisers. Google has long recognized that its competitors will not be able to compete without adequate scale.  The agreement between Apple and Google suppresses the ability of Google's competitors to achieve any scale of significance to be able to compete against Google. That economic prohibition would be eliminated if the agreement between Apple and Google were dissolved.

88.     The most effective way for Google to achieve scale is for its general search engine to be the preset search engine on mobile devices, computers, and other devices; and to agree with Apple not to compete.

89.     In 2005, Apple began using Google as the automatic, preset, out-of-the-box general search engine for Apple's Safari browser.

90.     In return, Google began to pay Apple a significant percentage of Google's yearly general search advertising revenue in the profit-sharing agreement.

91.     In 2007, Google extended this profit-sharing agreement to cover Apple's iPhones.

92.     In 2016, the agreement expanded further to include additional search access points — Siri (Apple's voice-activated assistant) and Spotlight (Apple's system-wide search feature) — making Google the automatic, preset, general search engine for all of Apple's devices.

93.     Currently, Google's profit-sharing agreements with Apple give Google an exclusive, preset position on all significant search access points on Apple computers and mobile devices.

94.     In exchange, since 2005, Google has agreed to share billions of dollars of advertising revenue with Apple each year in consideration for Apple's commitment not to compete in the search market.

95.     Since 2005, Google has become the primary, out-of-the-box exclusive search engine on Apple's Safari browser on its Mac computer, and, since 2007, on Apple's iPhone.

96.     Apple has been paid for the profits it would have made if it had competed with Google without having the expense of doing so.

97.     By reason of the profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has contributed to Google's dominant position in the search market because the more money Google makes in search, the more money Apple makes under the agreements.

98.     The non-compete agreement, the profit-sharing agreement, and the out-of-the-box preference agreement remove any incentive on the part of Apple to compete against Google in the search business.

99.     Google's CEO, Eric Schmidt, served on Apple's board of directors until 2009. In 2007 while serving as both an Apple Director and as Google CEO he stood onstage at the formal unveiling of the Apple iPhone with Steve Jobs, the founder of Apple, and blustered that, with Google search on the iPhone, "you can actually merge without merging" and "If we just sort of merged the two companies, we could just call them AppleGoo."

100.    Apple told Google: "Our vision is that we work as if we are one company."

101.    In 2008, Jobs met at Google's headquarters near Palo Alto with Larry Page and Sergei Brin, the two founders of Google, and with Andy Rubin, the head of Android development for Google, to discuss Google's recent purchase of the Android operating system.  Brin and Page considered Jobs a mentor.

102.    Jobs agreed to continue to give Google access to the exclusive, out-of-the-box search position on the iPhone, as long as there were "good relations" between the two companies.  According to Jobs:  "I said we would, if we had good relations, guarantee Google access to the iPhone and guarantee it one or two icons on the home screen."

103.    Jobs continued to meet with Google executives until his death in October 2011. In mid 2010, he met with Eric Schmidt who was then still CEO of Google, at a café at the Stanford Shopping Center.  In mid 2011 he met again with Larry Page in Job's living room.

104.    At each of these meetings these top executives solidified their agreement that they would cooperate rather than compete against each other.

105.    On information and belief, Google has paid Apple between $8 and 15 billion a year – an amount which is pure profit to Apple.

106.    Google makes approximately $25 billion a year in ad revenue from its searches on Apple's devices, iPhones, iPads, and Macs.

107.    Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

108.    In the past, Apple had actively worked on developing its own general search engine as a potential competitor to Google.  As a result, Apple is a potential direct competitor to Google in the search business and potentially threatens Google's dominance in the search business but for its agreement not to compete with Google and to share profits with Google.

109.    It has been estimated that if Apple were to launch its own search engine in competition with Google, at least $15 billion a year of Google revenue would go to Apple. This is equal to the estimated payment to Apple in 2021.

110.    Apple is the major threat to Google as a potential competitor in the search business.

111.    Apple could make it difficult for its iPhone users to get to Google – and Google knew it.

112.    But Apple has agreed with Google that it will not develop nor offer a general search engine in competition with Google.

113.    Google has locked in Apple's agreement not to compete by paying Apple billions of dollars from the revenues it derives from advertisers each year.

114.    The profits Google shares with Apple make up approximately 15 - 20 percent of Apple's worldwide net income.

115.     By paying billions of dollars to Apple each year, Google has locked in Apple's commitment not to compete with Google in search.

116.    By paying Apple billions of dollars each year to preserve its position as the initial, out-of-the-box exclusive search provider on Apple devices, Google and Apple have shared monopoly control and have the power to set prices and exclude competition in search.

117.    Consumers will rarely change the search provider on their devices after the devices have been purchased.

118.    By eliminating potential competition from Apple, and becoming Apple's exclusive search engine, Google can charge higher fees for search advertising and can steer consumers to its own proprietary apps.

119.    Google's own documents admit that Apple's "Safari default is a significant revenue channel" and that losing that exclusivity with Apple would substantially harm Google's bottom line.

120.    Google viewed the prospect of Apple's competition in the search business as a "Code Red" emergency.

121.    One of the meetings between the CEOs of Google and Apple took place at a dinner on March 10, 2017, between Sundar Pichai, CEO of Google and its parent Alphabet, Inc., and Tim Cook, CEO of Apple, during which they discussed their agreements and the search business.

122.    Tim Cook had actively promoted the profit-sharing arrangement from the very beginning in exchange for Apple's commitment not to compete in the search business.  Cook knew, as Google observed in a 2018 strategy document, that "People are much less likely to change [the] default search engine on mobile."

123.    After the meeting, Apple announced that Google would be the search vehicle for Siri, and Google announced that it had increased its payments in its sharing agreements for search traffic.

1
2
3
4
5
6
7
8
9
10



11       124.    The photo above was taken by a bystander who discovered a clandestine

12   meeting between Tim Cook of Apple and Sundar Pichai of Google.  As can be seen from the

13   photograph, the dinner was over and Mr. Pichai's left arm rested on a manila folder with

14   documents.

15
16
17
18
19
20
21
22
23
24
25
26
27
28



125.    The photo above was taken by a bystander from outside the restaurant where the CEOs of Google and Apple were at dinner.

126.    The profit-sharing agreements between Apple and Google have in fact resulted in Apple pushing more search traffic to Google and denying traffic to Google's competitors.

127.     It was reported that as late as 2014 Apple had been working on its own search engine.  However, Apple opted to receive the payment of billions of dollars from Google instead of competing with Google.

128.    Google's annual payments to Apple – estimated to be $8 billion to $15 billion a year – up from $1 billion a year in 2014, account for 14 to 21 percent of Apple's annual profits.

129.    In 2018, Apple's CEO Tim Cook and Google's CEO Sundar Pichai met again to discuss how Apple could further drive search advertising revenue to Google and increase the amount of Apple's share of the profit-sharing agreement.

130.    After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

131.    Apple's general counsel from 2009 to 2017, Bruce Sewell, described the relationship as one of "co-opetition."

132.    The Google-Apple agreement not to compete and to share in the profits substantially forecloses Google's search competitors from a substantial market.

133.    In 2019, almost 50 percent of Google's search traffic originated on Apple devices.

134.    By agreeing with Apple to pay Apple a substantial portion of the inflated income extracted from its advertisers, Google has locked in Apple's agreement not to compete for search advertising and by sharing it profits from search revenues from search advertisers with Apple, it has incentivized and ensured that Apple will faithfully maintain its agreement not to compete in the search advertising market.

## VIOLATIONS ALLEGED

### First Claim for Relief
*An Agreement Not to Compete in the Search Business*

135.    Plaintiff incorporates the allegations of paragraphs 1 through 134 above and 136-162 below.

136.    Defendants Google and Apple made an agreement that Apple would not compete with Google in the search business. In exchange for that agreement, Google paid Apple billions of dollars;  the Defendants engaged in profit-pooling of the advertising revenues from Google's search business; and Google was granted an exclusive position on

Apple's platforms to increase the revenues that would be shared.

137.   The Defendants' CEOs met privately and secretly to discuss and confirm this agreement and personally understood that ~~that~~ their agreement was a violation of the antitrust laws.

138.   The effect of this agreement is to eliminate the competition between Google and Apple for search, for advertisers and to suppress competition from other smaller search competitors such as Bing, Yahoo!, and DuckDuckGo.

139.   Because of Google's and Apple's agreement not to compete and to divide the market, prices have been higher, production has been lower, innovation has been suppressed, quality has been less, and consumer choice has been eliminated.

140.   On the other hand, in the absence of the anti-competitive agreements, and if Apple were to compete against Google in search as it previously intended to do, prices would be lower, production would be higher, the incentives for companies to develop and distribute innovative search products would be restored, quality would be higher, and consumer choice would be preserved.

141.   Google and Apple's agreement not to compete for search and not to compete for search advertising is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.   Google and Apple's agreement to share profits is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

143.   Google and Apple's agreement to grant preferential treatment to Google on all Apple devices excludes and forecloses competitors from a substantial market and enhances prices to advertisers and is therefore a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

144.    Google's and Apple's anticompetitive agreements have stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model;

145.    Google's and Apple's joint exclusionary conduct also substantially forecloses competition in the search advertising and general search text advertising markets, harming advertisers. By suppressing competition, Google has more power to manipulate the quantity of ad inventory and auction dynamics in ways that allow it to charge advertisers more than it could in a competitive market. Google can also reduce the quality of the services it provides to advertisers, including by restricting the information it offers to advertisers about their marketing campaigns.  Apple has voluntarily participated in and profited by ~~Google's by~~ agreeing not to compete with Google and by sharing the profits from Google's monopoly on search advertising.

146.    By restricting competition in general search services, Google's and Apple's conduct has harmed consumers by reducing the quality of general search services (including dimensions such as privacy, data protection, and use of consumer data), by lessening choice in general search services, and by impeding innovation.

147.    Google's anticompetitive acts have had harmful effects on both competition and consumers.  Absent Google's and Apple's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased consumer choice, and a more beneficial user experience. In addition, more competitive search advertising and general search text advertising markets would allow advertisers to purchase ads at more attractive terms, with better quality and service. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and higher consumer welfare overall.

*Second Claim for Relief*

*Conspiracy to Monopolize in Violation of Sherman Act § 2*

148.    Plaintiff incorporates the allegations of paragraphs 1 through 147 above and 149-162 below.

149.    Defendants have entered into a combination to suppress and eliminate actual and potential competition in the search business and to fix high, arbitrary prices.  The combination of Apple and Google to achieve "Our vision . . . that we work as if we are one company"  results in higher prices, lower quality and the suppression and ultimate suppression of actual and potential competitors, including DuckDuckGo, Yahoo!, and Bing.

150.    Google controls 94% of the search market and all the actual and potential competitors have the remaining 6%.

151.    Google and Apple have combined to monopolize the search business by agreeing that Apple would not compete with Google on search.

152.    In furtherance of that agreement, Google agreed that it would share its profits with Apple, and Apple agreed to include Google as the only search engine in all of Apple's devices.

153.    They further agreed that the CEOs of each of the companies would meet secretly from time to time to confirm and enforce both the agreement and the means used to further the agreement.

154.    As a combination in fulfillment of their vision, Apple and Google have the size and the economic power to be able to fix prices and exclude competition, and in fact do so.

155.    As they themselves admitted:  "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo";  and their general counsel's description of

their relationship as "coopetition."

156.   Google's and Apple's anticompetitive practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

157. Google's and Apple's anticompetitive acts have had harmful effects on competition and consumers.

## FRAUDULENT CONCEALMENT

158.   As a result of the private and secret meetings by the CEOs of Google and Apple since at least 2005 until shortly before the filing of this complaint, Plaintiff and members of the Plaintiff Class had no knowledge that Defendants were violating the antitrust laws as alleged herein and had no knowledge of facts that might have led to their discovery. In addition, the Defendants took affirmative steps to conceal their conspiracy in private and clandestine meetings between their CEOs.

159.   Plaintiff and the members of the class could not have discovered Defendants' violations at any time prior to this date by the exercise of due diligence because of the fraudulent and active concealment of the conspiracy by Defendants through various means and methods designed to avoid detection.

160.   Defendants secretly conducted meetings and made agreements in furtherance of the conspiracy, confined such information concerning the conspiracy to key officials and engaged in conduct creating an estoppel to assert the statute of limitations.

# REQUEST FOR RELIEF

## Requested Relief for The Benefit of The Class

161.    To remedy these illegal acts, Plaintiff and the Class request that the Court grant them the following relief:

a.    Adjudge, decree, and declare void  that the alleged contract, combination and conspiracy between Google and Apple  that Apple not compete with Google in the search business and to divide the search business are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

b.    Adjudge, decree, and declare void that the alleged contract, combination and conspiracy between Google and Apple to pool or share profits of the search business are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

c.    Adjudge, decree, and declare void that the alleged contract, combination and conspiracy between Google and Apple to give preferential search positions to Google in Apple devices are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

d.    Adjudge, decree, and declare void that the alleged contract, combination and conspiracy between Google and Apple that Apple not compete with Google in the search business and to divide the search business, to share profits of the search business, and to give preferential search positions to Google in Apple devices are, taken together, are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

e.    Adjudge, decree, and declare void that the alleged contract, combination and conspiracy between Google and Apple (1) that Apple not compete with Google in the search business; (2) that Apple and Google share the profits of Google's search

business;  (3) that Apple give Google preferential search position in Apple devices; and (4) that Google and Apple maintain control of 94% of the search business, with the power to fix prices and exclude competition, and in fact do so, are illegal combinations and conspiracies to monopolize in violation of Section 2 of the Sherman Act;

   f. Enter judgment in favor of Plaintiff CALIFORNIA CRANE SCHOOL INC. and the class and against Defendants and award Plaintiff and the class threefold the damages sustained by them according to law and award Plaintiff and the class their reasonable attorneys' fees and costs, and any pre-judgment and post-judgment interest as permitted by law; and

   g. Enter any additional relief for Plaintiff and the class that the Court finds just and proper.

### Forward-Looking Public Injunctive Relief for The General Public as A Whole

  162. For the benefit of the general public as a whole, it is requested that the Court:

   a. Enjoin Defendants from future agreements that Apple not compete with Google in the search business and to divide the search business, from future agreements to share or pool profits, from future agreements to provide Google with exclusive search privileges on Apple devices and from future agreements to meet for the purpose of discussing anticompetitive conduct;

   b. Enjoin and prohibit Defendant Cook and Defendant Pichai from making future agreements that Apple not compete with Google in the search business and to divide the search business, from making future agreements for Google to share or pool profits with Apple, from making future agreements to provide Google with exclusive search privileges on Apple devices and from making future agreements to meet for the purpose of discussing such anticompetitive conduct.

1

**Disgorgement For the Future Benefit of The General Public as A Whole**

2

    c.        For the benefit of the general public as a whole**,** it is requested that the

3

Court require Apple to disgorge all payments, plus interest from the first payment, made by

4

Google to Apple in consideration of Apple's agreement not to compete against Google to

5

preclude Google and Apple from using those funds in the future  as capital available to fund or

6

promote any future agreements between them not to compete in the search business or divide

7

it;

8

9

    d.        For the benefit of the general public as a whole**,** it is requested that the

10

Court require Apple to disgorge all payments, plus interest from the first payment, made by

11

Google to Apple in consideration of their agreement to pool or share profits to preclude

12

Google and Apple from using those funds in the future as capital available to fund or promote

13

any future pooling or sharing of profits by Google with Apple.

14

15

    e.        For the benefit of the general public as a whole, it is requested that the

16

Court require Apple to disgorge all payments, plus interest from the first payment, made by

17

Google to Apple in consideration of Apple's agreement to provide exclusive, out-of-the-box

18

access on its devices to Google to preclude Google and Apple from using those funds in the

19

future as capital available to fund or promote future exclusive out-of-the-box access by

20

Google to Apple's devices.

21

    f.        For the benefit of the general public as a whole, it is requested that the

22

Court enter any other preliminary or permanent relief necessary and appropriate to restore

23

competitive conditions in the search business affected by Google and Apple's unlawful

24

conduct to preclude Google and Apple from engaging in the anticompetitive conduct alleged

25

herein in the future.

26

27

28

**<u>Divestiture For the Future Benefit of The General Public as A Whole</u>**

g.  For the future benefit of the public as a whole, it is requested that the Court

effect a forward-looking divestiture of the anticompetitive business structures, that Google and

Apple have erected and abused, by dividing Google into separate and independent companies

and by dividing Apple into separate and independent companies to reestablish competition in

search in the future, just as was necessary to reestablish competition in *United States. v.*

*Standard Oil Co. of New Jersey*, 221 U.S. 1, 78 (1911), stating:

> (:  "…the application of remedies two-fold in character becomes essential: 1st. To
> forbid the doing in the future of acts like those which we have found to have been done
> in the past which would be violative of the statute. 2d. The exertion of such
> measure of relief as will effectually dissolve the combination found to exist in
> violation of the statute, and thus neutralize the extension and continually operating
> force which the possession of the power unlawfully obtained has brought and will
> continue to bring about.")

in which Standard Oil was divided by the Court into the following separate and independent

companies: Standard Oil of Ohio, Standard Oil of Indiana, Standard Oil of New York,

Standard Oil of New Jersey, Standard Oil of California, Standard Oil of Kentucky, Standard

Oil of Iowa, Standard Oil of Minnesota, Standard Oil of Illinois, Standard Oil of Kansas,

Standard Oil of Missouri, Standard Oil of Nebraska, Standard Oil of Louisiana—a/k/a Exxon,

Mobile, Chevron, Amoco, Sohio, Conoco *et cetera.*

h.      For the future benefit of the general public as a whole, it is requested

that the Court enter any other future injunctive relief necessary and appropriate to restore

competitive conditions in the future in the search business affected by Google and Apple's

unlawful conduct;

i.      For the future benefit of the general public as a whole, it is requested that the Court enter any other future injunctive relief for the benefit of the general public as a whole that the Court finds just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.


Dated:  March 29, 2022             ALIOTO LAW FIRM



By:  /s/ *Joseph M. Alioto*

      Joseph M. Alioto (SBN 42680)
      Tatiana V. Wallace (SBN 233939)
      Angelina Alioto-Grace (SBN 206899)
      One Sansome Street, Suite 3500
      San Francisco, CA  94104
      Telephone: (415) 434-8900
      Attorneys for Plaintiffs

*First Amended Complaint for Violation of the Sherman Act*

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G.
PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Robert J. Bonsignore (SBN
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE PC
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmoore@aliotolaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H. WINTERS
388 Market St. Suite 1300
San Francisco, California 94111
Telephone: (415) 398-2941
Email: sawmill2@aol.com

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com