Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

CALIFORNIA CRANE SCHOOL, INC.,
on behalf of itself and all others similarly
situated

                Plaintiff,

vs.

GOOGLE LLC, ALPHABET, INC., XXVI
HOLDINGS, INC., APPLE, INC., TIM
COOK, SUNDAR PICHAI, and ERIC
SCHMIDT,

                Defendants.

Case No:  3:21-cv-10001 AMO

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT  (15 U.S.C. §§ 1 AND 2), VIOLATIONS OF THE CALIFORNIA CARTWRIGHT ACT (BUSINESS & PROFESSIONS CODE §§ 16700, ET SEQ.),  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") (BUSINESS & PROFESSIONS CODE §§ 17200 ET SEQ.) AND FOR UNJUST ENRICHMENT UNDER CALIFORNIA COMMON LAW**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

    1.     This is a private antitrust class action lawsuit brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. 15, 26) for actual and potential damages and injunctive relief caused by reason of and made necessary by the Defendants' past, present and substantially threatened continued violations of Sections 1 and 2 of the Sherman Antitrust Act

(15 U.S.C. 1, 2).  This Court has subject matter jurisdiction under 28 U.S.C. Section 1331 in that the issue presented is a federal question.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. Section 1337 in that this civil action arises out of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

2.      This case is also a private antitrust class action brought pursuant to the California Cartwright Act for actual and potential damages and injunctive relief, restitution and disgorgement by reason of and made necessary by the Defendants' past, present and substantially threatened continued violations of Sections 16700, 16720, 16722, 16750, 16757, 16760(d), and 16761 of the California Business and Professions Code.  The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.   In addition, the Court has supplemental subject matter jurisdiction of the pendent state law Cartwright Act claim under 28 U.S.C. § 1367.

3.      This case is also filed by Plaintiff as an individual for injunctive relief, restitution and disgorgement by reason of the Defendants' past, present and substantially threatened continued violations of California's Unfair Competition Law ("UCL") pursuant to Sections 17200, 17201, 17203, 17204 and 17205 of the California Business and Professions Code.  The Court has supplemental subject matter jurisdiction of the pendent California state UCL claim under 28 U.S.C. § 1367.

4.      Plaintiff California Crane School ("CCS") is a crane operator training school.  When unlicensed crane operators seek certification from the state, they need to attend a school that trains and ultimately certifies them. Unlicensed crane operators use Google to

locate and arrange to attend a school like CCS. CCS' service is analogous to a BAR Review course for law students. CCS advertises its services on Google for which it pays Google an exorbitant fee. More competing search engines would expand CCS' opportunities for advertising and result in more competitive advertising prices. The Google-Apple combination and agreements artificially constrict this advertising market and result in higher prices for advertising to advertisers like CCS.

5.     Plaintiff charges that the Defendants, Google and Apple, have agreed to divide the markets for both search and search advertising.  In particular, Plaintiff charges that Apple has agreed not to enter the search market and not to engage in search advertising in exchange for the payment by Google to Apple of billions of dollars in profits that are being generated by Google in its search advertising business.  Apple does nothing for these billions except permit Google to be the default search engine on its computers, iPhones and mobile devices – and, of course, agree with Google not to enter the search market and not to compete with Google for search advertising.

6.     In *Citizen Publishing Co. vs. United States*, 394 U.S. 131 (1969) two newspapers, the Star and the Citizen entered into a joint operating agreement in a jointly held company, in which rates were set and there was profit pooling and a non-competition provision. The U.S. Supreme Court affirmed the district court's grant of summary judgment on the ground that the agreement to share profits and not to compete was a *per se* violation of Section 1 of the Sherman Act.

7.     In *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), competitors were providers of bar review courses who entered into a revenue-sharing agreement outside of Florida. The Supreme Court reversed the grant of summary judgment to defendants and held that horizontal market allocation agreements are *per se* violations of Section 1 of the Sherman

Act and are "anticompetitive regardless of whether the parties split a market within which they both do business or whether they merely reserve one market for one and another for the other.

8.     Both Supreme Court opinions demonstrate clearly and succinctly how the Defendants' conduct, as alleged by Plaintiff in this case, is a violation of law.

9.     Plaintiff has alleged: a horizontal market allocation agreement between Apple and Google that Apple will not compete against Google and that Google will pay Apple not to compete.

10.     The agreement between Apple and Google to share revenue and profits reduces Apple's incentive to compete with Google. The quid pro quo for the agreement is that Google must pay Apple billions of dollars to stay out of the market and Apple must discriminate in favor of Google's search engine thereby foreclosing all other potential competitors. Indeed, the more money that Google makes by monopolizing search and search advertising, the more money Apple makes.

11.     The extent of the payments being made to Apple to ensure that it has no incentive to compete with Google is presently unknown but estimated to be in the billions of dollars per year.  Thus far, Plaintiff has been prevented from obtaining the written Google-Apple agreements which set out the combination and conspiracy in detail and prevented from inquiring into the oral agreements between Google and Apple as both written discovery and even limited deposition discovery have been stayed by the Court.

12.     The Defendants Apple and Google have agreed in various writings, including in their written Revenue Sharing Agreement and in their written Pre-Installation Agreement that Apple would not compete in the search business and the search advertising market in competition with Google.

13.     The Defendants have also orally agreed that Apple would not compete in the search business and the search advertising market in competition with Google.

14.     As a direct result, Google has dominated the search engine market and the search advertising market both globally and in the United States.  See charts following:

GLOBAL SEARCH ENGINE MARKET SHARE 2023



From https://www.oberlo.com/statistics/search-engine-market-share

U.S. SEARCH ENGINE MARKET SHARE 2023



From https://www.oberlo.com/statistics/search-engine-market-share#:~:text=US%20search%20engine%20market%20share,%2C%20compared%20to%2093.37%25%20worldwide.

15.     Google's dominance in the U.S. search engine market is even more impressive when it comes to search queries on mobile phones, with 95.12% of all mobile search queries handled by Google, as opposed to 80.79% on desktops and 82% on tablets.[1]

---

[1] https://www.oberlo.com/statistics/search-engine-market-share#:~:text=US%20search%20engine%20market%20share,%2C%20compared%20to%2093.37%25%20worldwide.

GLOBAL SEARCH ADVERTISING REVENUE SHARE 2022



<u>Source</u>:  Statista Digital Market Insights, including mobile and desktop search engine advertising, keyword advertising and sponsored links.[2]

16.     Google also dominates the U.S. Search advertising market by revenue.

17.     In 2021, Google accounted for an estimated 28.6 percent of the total digital advertising revenue generated in the United States and was the largest digital ad publisher in the country.[3]

18.     In exchange for Apple's written commitment not to compete in the search business and the search advertising business in competition with Google as set forth in the written Apple-Google Revenue Sharing Agreement, Google agreed to share its profits from

---

[2] https://www.statista.com/chart/29271/search-advertising-market-share/#:~:text=According%20to%20estimates%20from%20Statista%27s,to%20more%20than%20%24150%20billion.

[3] https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/

the search business and the search advertising business with Apple and, in addition, to pay Apple extra billions of dollars.

19.     Google and Apple further agreed that Apple would make Google the default search engine on its computers and mobile devices in their written Apple-Google Pre-Installation Agreement.

20.     One senior Google executive has purportedly stated to the government that revenue sharing "is a bitter pill for carriers, [but] a generous revenue share is the sugar that makes it go down smoother."

21.     In 2018, Apple's and Google's CEOs met to discuss how the companies could work together to drive search revenue growth. After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

22.     The written Apple-Google Revenue Sharing Agreement contains provisions that commit Apple not to enter the search business.

23.     The written Apple-Google Pre-Installation Agreement contains provisions that commit Apple not to enter the search business.

24.     The written Apple-Google Revenue Sharing Agreement contains provisions that commit Apple not to enter the search advertising business.

25.     The written Apple-Google Pre-Installation Agreement contains provisions that commit Apple not to enter the search advertising business.

26.     Although there is value in being the default browser on Apple's devices, a default browser can always be removed.  The real value to Google that justifies its board of directors' business decision to pay billions in revenue sharing to Apple - as is called for in

these written Apple-Google agreements – is, in reality, Apple's written commitment not to compete against Google in the search business and in the search advertising business.

27.     Apple has agreed to assist Google in building its search business and its search advertising business for their mutual benefit.

28.     For Google to be able to generate sufficient billions of dollars to pay to Apple, Apple has agreed that Google would be the only search engine automatically included in all of Apple's devices.

29.     Apple's agreement to include Google as the initial search engine on all of Apple's devices gives Google a substantial and unfair anticompetitive advantage over other search providers, actual and potential, including Yahoo!, DuckDuckGo, Bing, and others.

30.     Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and non-Google favored advertisers.

31.     These written agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Officers and Chairmen of Apple and Google.

32.     The architects of the combination during the early 2000's were Steve Jobs, the CEO and Chairman of Apple, and Eric Schmidt, the CEO and Chairman of Google.

33.     More recently, the continued combination to eliminate competition between Apple and Google for the search business has been re-affirmed by Tim Cook, the CEO of Apple, and Sundar Pichai, CEO and Chairman of Google.

34.     The meetings between the CEOs and Chairmen of Apple and Google were clandestine so as to fraudulently conceal their agreements not to compete in the search business and the search advertising market.

35.    The Plaintiffs do not know when the secret meetings began but allege that they began with Messrs. Jobs and Schmidt and that they have continued in force under Messrs. Cook and Pichai.

36.    Some of the secret meetings have been photographed and taped by bystanders who chanced to notice the conspirators meeting together.

37.    These meetings were undertaken to promote the shared vision that Apple and Google would act in effect as one company that was merged without merging.  Apple and Google invented the word "co-opetitive" to describe their unlawful combination and conspiracy.

38.    These CEOs and Chairmen knew and understood that the agreements that they had made were illegal under the Antitrust Laws of the United States.  The CEOs and Chairmen had been advised that their agreement to divide the markets for search and search advertising would violate the antitrust laws.

39.    Notwithstanding the advice of their counsel, the CEOs and Chairmen of Apple and Google insisted on going forward with their agreement in contumacious disregard of the law, thereby waiving any privilege that otherwise would attach to communications with their counsel.

40.    The overall purpose of the Defendants' agreements was to eliminate the potential competition of Apple entering the search business and the search advertising market.

41.    In furtherance of the unlawful agreements, the Defendants engaged in the following acts and means, among others, to ensure the success of the agreement:

        a.    secret meetings between the CEOs;

        b.    revenue-sharing and profit-pooling;

        c.    payment of billions of dollars every year by Google to Apple;

d.    automatic inclusion of Google search on Apple devices, to the exclusion of other search companies, and non-Google favored advertisers;

e.    written agreements that Apple would not compete in search and search advertising;

f.    oral agreements that Apple would not compete in search and search advertising;

g.    the recognition and agreement that the more Google made the more Apple made; and

h.    the elimination of Apple as a potential competitor in the search business and in the search advertising business.

42.    More than half (50%) of Google's search business was conducted through use of Apple devices.

43.    Because more than half of Google's search business was conducted through Apple devices, Apple was a major potential threat to Google to build its own search and search advertising business, and that threat was designated by Google as "Code Red."

44.    Google paid billions of dollars to Apple and agreed to share its revenues and profits with Apple to eliminate the threat and fear of Apple as a competitor in the search and the search advertising business.

45.    Google viewed the possibility of Apple as a potential competitor in the search and in the search advertising business to be  "Code Red."

46.    If Apple became a competitor in the search business and the search advertising business, Google would have lost half of its business.

47.    Google, as of September 2020, controlled 94% of the mobile search engine U.S. market share.

48.     Google, as of September 2020, controlled 82% of computer search engine U.S. market share.

49.     For the last 10 years, from 2009 to 2019, Google increased its control of the search engine U.S. market from 80% to 88%.

50.     Because of its market share in the search market, Google is able to charge and in fact Google charges higher prices to advertisers in the search adverting market than would otherwise be the case in the absence of the Google-Apple agreements.

51.     Search engines have become one of the most powerful tools on the internet and an essential part of modern life. Around 30 percent of global web traffic is generated via online search, and as millions of shoppers flock to websites such as Google for product research every day, companies have started to integrate online search campaigns into their digital marketing mix. Ads shown on search result pages are explicitly targeted to keywords entered by consumers, which makes search advertising a highly effective marketing method. In 2021, search advertising spending in the United States amounted to 84.7 billion U.S. dollars, while spending on mobile search advertising continued to accelerate as consumers shop on their smartphones more vigorously than ever.

52.     "Google is the gateway to the internet and a search advertising behemoth," U.S. Deputy Attorney General Jeffrey Rosen said. "It has maintained its monopoly power through exclusionary practices that are harmful to competition."

53.     The United States Department of Justice has filed a lawsuit against Google for monopolization of the general search market and the market for search advertising.  Google has used its monopoly power to tie up distribution channels for online search through its revenue sharing agreements and through its pre-installation agreements.

54.     Google has "foreclosed competition for internet search" through exclusionary agreements that deny rivals the opportunity to achieve the necessary scale to challenge Google's dominance.

55.     Google holds 88% of the U.S. search market, with 94% of mobile searches occurring on its services.

56.     Google's conduct has harmed consumers by lowering the quality of search services and by reducing choice.

57.     Google owns more than 70% of the general search advertising market and has used its monopoly power to charge more for lower-quality services than would be possible in the face of competition.

58.     By reason of the agreement between Apple and Google in the general search market and in the search advertising market, the prices, the production, the innovation, and the quality of both the general search business and the search advertising business have been substantially, adversely, and anticompetitively affected.

59.     In addition to the potential and actual damages suffered by reason of the conspiracy, the Plaintiff and the class also charge under Section 16 of the Clayton Act that the illegal payments by Google to Apple and the illegal profit sharing, and all payments by Google to Apple in furtherance of their written agreements, must be disgorged under principles of equity on the grounds that these wrongdoers cannot be allowed or permitted to profit from their own wrongdoing.

60.     Because of the fraudulent nature of the clandestine meetings of these CEOs and Chairmen of Apple and Google, and because of the secrecy of their agreements, and because Plaintiff has not yet had the opportunity to conduct discovery, the exact amounts and times of

the payments, rebates, and profit sharing that Google made to Apple are alleged on information and belief.

61.     In any one year, Google paid Apple more than $15 billion.

62.     In any one year, Google paid Apple more than $3 billion.

63.     In any one year, Google paid Apple more than $6 billion.

64.     In any one year, Google paid Apple more than $9 billion.

65.     In any one year, Google paid Apple more than $10 billion.

66.     In any one year, Google paid Apple more than $12 billion.

67.     In any one year, Google paid Apple more than $12 billion.

68.     In any one year, Google paid Apple more than $15 billion.

69.     From 2005 up to and including the time of the filing of this Complaint, Google paid Apple more than $50 billion not to compete in the general search business and in the search advertising business.

70.     Google paid Apple to stay out of the general search business.

        Google paid Apple to stay out of the search advertising business.

71.     Apple accepted the payments from Google and stayed out of the general search business.

72.     Apple accepted the payments from Google and stayed out of the search advertising business.

73.     Apple promoted Google in the general search business and in the search advertising business against other search providers and non-favored advertisers.

74.     Google has "locked up" distribution through exclusionary contracts with Apple.

75.     Google has used its revenue-sharing model with Apple to expand its dominance. One senior executive has purportedly stated to the government that revenue sharing "is a bitter pill for carriers, and a generous revenue share is the sugar that makes it go down smoother."

76.     Under the current agreement between Apple and Google, which has a multi-year term, Apple must make Google's search engine the default for Safari and use Google for Siri and Spotlight in response to general search queries. In exchange for this privileged access to Apple's massive consumer base, Google pays Apple billions of dollars in advertising revenue each year, with public estimates ranging around $8–12 billion. The revenues Google shares with Apple make up approximately 15–20 percent of Apple's worldwide net income.

77.     Few people change the search default on Safari from Google to a competing general search engine, making Google the de facto exclusive general search engine on Apple. That is why Google pays Apple billions of dollars on a yearly basis for default status.

78.     Indeed, Google recognizes that the "Safari default is a significant revenue channel" and that losing the deal would fundamentally harm Google's bottom line. Thus, Google views the prospect of losing default status on Apple devices as a "Code Red" scenario. In short, Google pays Apple billions to be the default search provider, in part, because Google knows the agreement increases the Google's impregnable monopoly.

79.     Apple's Revenue Sharing Agreement incentivizes Apple to push more and more search traffic to Google and accommodates Google's strategy of denying access to distribution to Google's competitors.  In 2018, Apple's and Google's CEOs met to discuss how the companies could work together to drive search revenue growth. After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

80.     By paying Apple a portion of the monopoly profits extracted from advertisers, Google has aligned Apple's financial incentives with its own and vice versa.

81.     Google's "traffic acquisition costs" in its quarterly financial filings (which euphemism refers to Google's accounting of its payments and revenue sharing with Apple and others) amount to billions of dollars. That figure represents the payments Google makes to companies like Apple to be the default search provider on their platforms.

82.     Consumers largely do not shift away from default settings.  As one of Google's executives bluntly put it, "most users just use what comes on the device" and do not attempt change search engines or download or use other general search services.

83.     Google's revenue-sharing partners, including Apple, turn down opportunities to preinstall or otherwise enable innovative, search-related apps because those new partnerships could violate Google's demand for exclusivity.

84.     There is no incentive for Apple to walk away from the pre-installation agreement and the revenue sharing agreement with Google, and no incentive now for Apple to compete with Google by developing its own search engine and search advertising business, even though it had begun to develop and announced the development of its own search engine prior to reaching agreements with Google, since now, even if it did, Google would continue to benefit from the Apple devices with defaults already previously set to Google. A rival search provider would be left with no practical way to generate revenues from those previously set devices, regardless of how competitive its general search service might otherwise be.

85.     In the U.S. more than half of search queries are "covered by Google's exclusionary agreements" — 60% overall and 80% on mobile devices. Almost half of search queries that aren't covered by those contracts take place on "access points" owned by Google,

like its Chrome browser and Pixel phones, giving it effective control of about 80% of general search queries in the U.S.

86.     Apple and Google have the motive, the opportunity by reason of their meetings, and the ability to control the search business, to share in the profits from the search advertising business, and to eliminate the potential competition of Apple.

87.     By reason of Google's dominant monopolistic position in the general search market and its resulting dominant and monopolistic position in the search advertising market, Google is able to charge monopolistic prices for its search advertising, Plaintiff and the putative class have paid more to Defendant Google to place their ads on Google's search engine than they would have paid in a competitive search advertising market within the United States, especially if Apple had entered the search business as it had originally intended and competed with Google in the search advertising business.

88.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

89.     The Court has personal jurisdiction over the Defendants because all Defendants are domiciled and are found within the United States, and venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Defendants transact business and are found within this District.

90.     Defendants Google and Apple have engaged in, and their activities have affected substantially the interstate and foreign trade and commerce of the United States. Google and Apple provide a range of products and services that are intentionally marketed, distributed, sold, and offered to consumers throughout the fifty states and across state lines and in foreign countries.  The restraints alleged in this Complaint affect and are a burden on

the free and open trade between and among the States of the United States and the trade and commerce between and among the United States and foreign nations.

The Parties

91.     Plaintiff CALIFORNIA CRANE SCHOOL, INC. is a corporation organized under the laws of the state of California.  Plaintiff has directly paid Google for the placement of search advertising on Google search.  Plaintiff has paid Google for Google advertising consisting of ads generated in response to online search queries for "crane school", "crane operators" and other keywords, general search text ads and other, specialized search ads. Plaintiff has for many years paid rates for advertising on Google that have been inflated by the Defendants' conspiracy.

92.     Defendant GOOGLE, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Mountain View, California.  Google is a subsidiary of Defendant XXVI Holdings Inc., which is a subsidiary of Defendant Alphabet Inc. Defendant Alphabet Inc. is a publicly traded company that is incorporated and existing under the laws of the State of Delaware.  Its principal executive offices are in Mountain View, California. (Unless separately noted, Defendants Google, XXVI Holdings Inc. and Alphabet will hereinafter and above be collectively referred to as "Google".)

93.     Defendant APPLE, INC. (hereinafter and above referred to as "Apple") is a corporation organized and existing under the laws of the State of Delaware.  It is headquartered in Cupertino, California.

94.     Defendant TIM COOK is the current CEO of Apple, Inc.  Defendant Cook personally negotiated the written and oral contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at

secret meetings with his counterpart Defendant Pichai of Google. Defendant Cook's acts were authorized and ratified by Apple, and Defendant Cook was paid bonuses for the anticompetitive success of the agreements with Google.  The board of directors of both Google and Apple knew of these agreements and understood their purpose, intent and motive, and approved and ratified them.

95.     Defendant SUNDAR PICHAI is the current CEO of Defendant Alphabet Inc. and of Defendant Google LLC.  Defendant Pichai personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Defendant Cook of Apple. Defendant Pichai's acts were authorized and ratified by Google, and Defendant Pichai was paid bonuses for the anticompetitive success of the agreements with Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent and motive, and approved and ratified them.

96.     Defendant ERIC SCHMIDT is the former CEO and Chairman of Google. Defendant Schmidt personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterparts Steve Jobs and Defendant Cook of Apple. Defendant Schmidt's acts were authorized and ratified by Google, and Defendant Schmidt was paid bonuses for the anticompetitive success of the agreements with Apple.  Defendant Schmidt served on the Board of Directors of both Google and Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent and motive, and approved of and ratified them.

97.     Various persons, partnerships, firms, and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown,

have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.

98.     Apple and Google have achieved their size by multiple acquisitions of competitors and potential competitors, all of which have violated Section 7 of the Clayton Antitrust Act (15 U.S.C. §18).

99.     Since 2000, Apple has acquired more than 120 competitors, potential competitors, or "product-extension merger" companies for billions of dollars. *FTC vs. Procter & Gamble Co.*, 386 U.S. 568 (1967).

100.    Since 2000, Google has acquired more than 247 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.

101.    Apple and Google are two of the largest companies in the world.

102.    Apple and Google have abused their size by their agreement not to compete in the search market and in the search advertising market, by their profit sharing, by their preferential search settings, by their exclusion of non-favored Google advertisers and by their suppression of actual and potential search providers.

103.    Apple and Google have abused their size by engaging in anticompetitive conduct, some of which has resulted in fines in the billions of dollars.

104.    Apple has been found to have engaged in a per se conspiracy with book publishers the fix the price of ebooks. *United States v. Apple, Inc.,* 791 F.3d 290 (2d Cir 2015).

105.    The United States has alleged that Google has engaged in monopolizing the AdTech Market involving AdTech tools (software) that link publishers and advertisers.  In this regard it has purchased Double Click, ADMob, Invite Media, and Ad Meld in order to

manipulate advertising auctions.  *United States v. Google, LLC*, Case 1:23-cv-00108, USDC, ED Virginia.

106.    Although "Mere size * * * is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly * * * size carries with it the opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."  *United States v. Swift*, 286 U.S. 106 (1932).  Also see *United States v. Aluminum Co. of American*,  148 F.2d 416, at 430 (2d Cir 1945), Judge Learned Hand by virtue of the certificate of the Supreme Court, acting under the authority of the Supreme Court; *United States v. Paramount Pictures*, 334 U.S. 141, 174 (1948).

107.    Both Apple and Google have abused their size and have utilized their size in the past for unlawful purposes, using unlawful means to achieve unlawful objectives.

108.    Both Apple and Google have abused their size by engaging in unlawful acquisitions under Section 7 of the Clayton Antitrust Act and have been found to have engaged in anticompetitive conduct.

109.    Indeed, Google has been fined billions of dollars for having abused its size by engaging in anticompetitive conduct.

110.    The European Commission has recently fined Google 2.42 billion Euro for breaching EU antitrust proscriptions by abusing its market dominance in search to provide an illegal advantage to other Google products, including its comparison-shopping service.

111.    The current CEO of Defendant Alphabet Inc. is Sundar Pichai, who is also the CEO of Google LLC.  The current CEO of Defendant Apple Inc. is Tim Cook.

112.    Defendant Google is one of the wealthiest companies in the world, with a market value of over $1 trillion and annual revenue exceeding $180 billion.

113.    As of November 30, 2021, Google shareholder equity is $244.57 billion, and its market cap is $1.892 trillion.

114.    Google's revenue for 2021 through September is $239.21 billion and its net income is $70.62 billion.

115.    Google's CEO Sundar Pichai was awarded a $242 million pay package after taking control of Alphabet in 2019.  Pichai has earned nearly $1 billion in stock grants over the last five years.

116.    Google has achieved pre-eminent power in search. When asked to name Google's biggest strength in search, Google's former CEO explained: "Scale is the key. We just have so much scale in terms of the data we can bring to bear."  By using profit sharing agreements to lock up scale for itself and deny it to others, Google has unlawfully built and maintains its search monopoly, so long as Apple abides by the agreement not to compete against Google in the search market and in the search advertising market.

117.    Apple is an American technology company that specializes in consumer electronics, software and online services.

118.    Apple was founded in 1976 and is now the largest information technology company by revenue in the United States, totaling $274.5 billion in 2020.

119.    Since January 2021, Apple has been the world's most valuable company. As of November 30, 2021, Apple shareholder equity is $63.09 billion, and its market cap is $2.712 trillion.

120.    Apple's revenue so far in 2021 through September is $365.82 billion and its net income is $94.68 billion.

121.     In 2020, Apple CEO Tim Cook was paid a $14.8 million salary and had $281 million worth of stock options that vested; in 2021 Cook was given 5 million Apple shares worth about $750 million.

122.     Apple devices account for roughly 60 percent of mobile device usage in the United States.

123.     Apple's Mac OS (operating system) accounts for approximately 25 percent of total computer usage in the United States.

124.     Apple and Google are currently worth more than $4.5 trillion combined.

125.     Apple and Google believe they are one company: "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo".  Their general counsel described the reality of their combination as "coopetition."

126.     Google's primary source of income is advertising revenue generated from its Google search engine.

127.     Google uses consumer search and consumer information to sell advertising.

128.     When a consumer uses Google, the consumer provides personal information and attention to the delivered searched page in exchange for search results. Google monetizes the consumer's information and attention in many ways, including by selling ads.

129.     As of September 2020, Google controlled 94 percent of the mobile search engine U.S. market share.  As of September 2020, Google controlled 82 percent of the computer search engine U.S. market share.



130.    These charts are taken from Figures 7 and 8 found at paragraph 93 in the
United States Government's first amended complaint against Google dated January 15, 2021,
filed in the District of Columbia, 1:20-cv-03010-APM.

131.    Google's next closest competitor in 2020 commanded less than 2% of the
mobile search market.  All the competitors, Yahoo!, Bing, DuckDuckGo, and others have less
than 7% of the market compared to Google's almost 94%.



132.     This chart is taken from Figures 6 found at paragraph 92 in the United States Government's first amended complaint against Google dated January 15, 2021, filed in the District of Columbia, 1:20-cv-03010-APM.

<u>The Business of General Search and Search Advertising</u>

133.     Ad spending in the Search Advertising market is projected to reach $118.20 billion in the United States in 2023.  Ad spending is expected to show an annual growth rate of 10.23%, resulting in a projected market volume of $174.50 billion by 2027.

134.     In the Search Advertising market in the United States, $113.20 billion of total advertising spending is projected to be generated through mobile in 2027.

135.     The market share of Google amounts to an estimated 71% of the Search Advertising market in 2022.[4]

136.     Pay-per-click (PPC) advertising was the original search advertising method used on the internet, but, in 1998, Google founders Larry Page and Sergey Brin introduced an auction-based PPC model. The highest bidders would appear at the top of the search results and lower bidders would appear further down. This is the approach that marketers use most frequently today.

137.     Advertisers using Google products can bid on search keywords — specific words and phrases that enable their ads to show up to relevant users in search results.  Any advertiser can choose from different bidding strategies. If an advertiser wants to generate clicks to its site, for instance, it might choose to do "cost-per-click" bidding, where it would pay when someone clicks on its ads. The advertiser can choose a maximum amount it wants to

---

[4] https://www.statista.com/outlook/dmo/digital-advertising/search-advertising/united-states#analyst-opinion

pay for that click, and each time an ad is eligible to appear for a search, an auction will determine whether the ad shows up, and in which position.

138.    Google also lets advertisers target a location, language and audience.

139.    There are currently six major search engines, four of which are international in scope: Google, Bing, Yahoo!, and DuckDuckGo. Yandex focuses on Russian speaking nations, while Baidu focuses on nations that speak Chinese. Due to its massive user base, Google is by far the most popular among advertisers.

140.    In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

141.    Scale is of critical importance to competition among general search engines for consumers and search advertisers. Google has long recognized that its competitors will not be able to compete without adequate scale.  The agreements between Apple and Google on revenue sharing and on default search engines suppress the ability of Google's competitors to achieve any scale of significance to be able to compete against Google. That economic prohibition would be eliminated if the agreements between Apple and Google were dissolved.

142.    The most effective way for Google to achieve scale is for its general search engine to be the preset search engine on mobile devices, computers, and other devices; and to agree with Apple not to compete in the search market and in the search advertising market,

143.    Apple began using Google as the automatic, preset, out-of-the-box general search engine for Apple's Safari browser in 2005.

144.    In return, Google began to pay Apple a significant percentage of Google's yearly general search advertising revenue in the profit-sharing agreement.

145.    In 2007, Google extended this profit-sharing agreement to cover Apple's iPhones.

146.    In 2016, the agreement expanded further to include additional search access points — Siri (Apple's voice-activated assistant) and Spotlight (Apple's system-wide search feature) — making Google the automatic, preset, general search engine for all of Apple's devices.

147.    Currently, Google's profit-sharing agreements with Apple give Google an exclusive, preset position on all significant search access points on Apple computers and mobile devices.

148.    In exchange, since 2005, Google has agreed to share billions of dollars of advertising revenue with Apple each year in consideration for Apple's commitment not to compete in the search market and the search advertising market.

149.    Since 2005, Google has become the primary, out-of-the-box exclusive search engine on Apple's Safari browser on its Mac computer, and, since 2007, on Apple's iPhone.

150.    Apple has been paid for the profits it would have made if it had competed with Google without having the expense and trouble of doing so.

151.    By reason of the profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has contributed to Google's dominant position in the search market and the search advertising market because the more money Google makes in search, the more money Apple makes under the agreements.

152.    The non-compete agreements, the profit-sharing agreement, and the out-of-the-box preference agreement remove any incentive on the part of Apple to compete against Google in the search business and in the search advertising market.

153.    Google's CEO, Eric Schmidt, served on Apple's board of directors until 2009. In 2007 while serving as both an Apple Director and as Google CEO he stood onstage at the formal unveiling of the Apple iPhone with Steve Jobs, the founder of Apple, and admitted

that, with Google search incorporated on the iPhone, "you can actually merge without merging" and, "If we just sort of merged the two companies, we could just call them AppleGoo."

154.   Apple told Google: "Our vision is that we work as if we are one company."

155.   In 2008, Jobs met at Google's headquarters near Palo Alto with Larry Page and Sergei Brin, the two founders of Google, and with Andy Rubin, the head of Android development for Google, to discuss Google's recent purchase of the Android operating system.  Brin and Page considered Jobs a mentor.

156.   Jobs agreed to continue to give Google access to the exclusive, out-of-the-box search position on the iPhone, as long as there were "good relations" between the two companies.  According to Jobs:  "I said we would, if we had good relations, guarantee Google access to the iPhone and guarantee it one or two icons on the home screen."

157.   Jobs continued to meet with Google executives until his death in October 2011. In mid 2010, he met with Eric Schmidt who was then still CEO of Google, at a café at the Stanford Shopping Center.  In mid 2011 he met again with Larry Page in Job's living room.

158.   At each of these meetings these top executives solidified their agreement that they would cooperate rather than compete against each other.

159.   On information and belief, Google has paid Apple between $8 and 15 billion a year – an amount which is pure profit to Apple.

160.   Google makes approximately $25 billion a year in ad revenue from its searches on Apple's devices, iPhones, iPads, and Macs.

161.   Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

162.   In the past, Apple intended to develop its own search engine.

163.    Apple had actively worked on developing its own general search engine as a potential competitor to Google that would replace Google as the default search engine on its devices.

164.    In fact, at one point Apple tested its own built-in search engine without any announcements, sending its users to websites using Apple's own internal search engine without involving outside search engines.  It directed the user to websites in search results without redirecting to Google or to any other search engine thereby showing that Apple was silently introducing its own search engine on iPhone, testing it with AI to make a search engine that was not browser-based.

165.    Apple developed Siri and Spotlight with the intent of making Siri and Spotlight part of a proprietary search engine, bringing Apple one step closer to competing with Google on search and search advertising.

166.    In fact, Apple continues to be a potential direct competitor to Google in the search business as well as in the search advertising market, and potentially threatens Google's dominance in the search business and search advertising market but for its agreement not to compete with Google and to share profits with Google.

167.    It has been estimated that if Apple were to launch its own search engine in competition with Google, at least $15 billion a year of Google revenue from the search advertising market would go to Apple.  This is equal to the estimated payment to Apple in 2021.

168.    Apple is recognized as the major threat to Google as a potential competitor in the search business and in the search advertising market.  Within Google itself executives believe that Apple is one of the few companies in the world that could offer a formidable alternative to Google.

169.    Google has also worried that without the Apple agreement, Apple could make it difficult for its iPhone users to get to Google – and Google knew it.

170.    A former Google executive has said that the prospect of losing Apple's traffic was "terrifying" to the company and would be a "Code Red".

171.    But Apple has agreed with Google that it will not develop nor offer a general search engine in competition with Google, nor will it compete with Google in the search advertising business.

172.    Google has locked in Apple's agreement not to compete by paying Apple billions of dollars from the revenues it derives from advertisers each year.

173.    The profits Google shares with Apple make up approximately 15 - 20 percent of Apple's worldwide net income.

174.    In 2020 Apple received an estimated $8 billion to $12 billion in annual payments – up from $1 billion a year in 2014 – in exchange for building Google's search engine into its products.  It is probably the single biggest payment that Google makes to anyone and accounts for 14 to 21 percent of Apple's annual profits.  That is pure profit.  That is not money Apple would be eager to walk away from.

175.     By paying billions of dollars to Apple each year, Google has locked in Apple's commitment not to compete with Google in search and search advertising.

176.    By paying Apple billions of dollars each year to preserve its position as the initial, out-of-the-box exclusive search provider on Apple devices, Google and Apple have shared monopoly control and have the power to set prices and exclude competition in search and in search advertising.

177.    Consumers will rarely change the search provider on their devices after the devices have been purchased.

178.    By eliminating potential competition from Apple, and becoming Apple's exclusive search engine, Google can charge higher fees for search advertising and can steer consumers to its own proprietary apps.

179.    Google's own documents admit that Apple's "Safari default is a significant revenue channel" and that losing that exclusivity with Apple would substantially harm Google's bottom line.

180.    Google viewed the prospect of Apple's competition in the search business as a "Code Red" emergency and "terrifying".

181.    One of the meetings between the CEOs of Google and Apple took place at a dinner on March 10, 2017, between Sundar Pichai, CEO of Google and its parent Alphabet, Inc., and Tim Cook, CEO of Apple, during which they discussed their agreements and the search business.

182.    Tim Cook had actively promoted the profit-sharing arrangement from the very beginning in exchange for Apple's commitment not to compete in the search business.  Cook knew, as Google observed in a 2018 strategy document, that "People are much less likely to change [the] default search engine on mobile."

183.    After the meeting, Apple announced that Google would be the search vehicle for Siri, and Google announced that it had increased its payments in its sharing agreements for search traffic.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



184.    The photo above was taken by a bystander who discovered a clandestine meeting between Tim Cook of Apple and Sundar Pichai of Google.  As can be seen from the photograph, the dinner was over and Mr. Pichai's left arm rested on a manila folder with documents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



185.    The photo above was taken by a bystander from outside the restaurant where the CEOs of Google and Apple were at dinner.

186.    The profit-sharing agreements between Apple and Google have in fact resulted in Apple pushing more search traffic to Google and denying traffic to Google's competitors.

187.    It was reported that as late as 2014 Apple had been working on its own search engine.  However, Apple opted to receive the easy payment of billions of dollars from Google instead of undertaking the task of competing with Google to develop its own search engine and entering the search advertising market.

188.    Google's annual payments to Apple – estimated to be $8 billion to $15 billion a year – up from $1 billion a year in 2014, account for 14 to 21 percent of Apple's annual profits.

189.    In 2018, Apple's CEO Tim Cook and Google's CEO Sundar Pichai met again to discuss how Apple could further drive search advertising revenue to Google and increase the amount of Apple's share of the profit-sharing agreement.

190.     After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

191.    Apple's general counsel from 2009 to 2017, Bruce Sewell, described the relationship as one of "co-opetition."

192.    The Google-Apple agreement not to compete and to share in the profits from Google's advertising substantially forecloses any of Google's search competitors from a substantial market.

193.    In 2019, almost 50 percent of Google's search traffic originated on Apple devices.

194.    By agreeing with Apple to pay Apple a substantial portion of the inflated income extracted from its advertisers, Google has locked in Apple's agreement not to compete for search advertising and by sharing it profits and revenues from search advertisers with Apple, it has incentivized and ensured that Apple will faithfully maintain its agreement not to compete in the search advertising market.

/ / /

/ / /

/ / /

/ / /

Both "General Search" and "General Search Advertising"
Are Relevant Antitrust Markets in
the United States

      1.    Search Services in the United States Is a Relevant Product and
Geographic Antitrust Market

195.    General search services in the United States is a relevant antitrust market. General search services allow consumers to find responsive information on the internet by entering keyword queries in a search engine such as Google, Bing, or DuckDuckGo.

196.    General search services are unique because they offer consumers the convenience of access to an extremely large volume of information across the internet. Consumers use general search services to find specific websites, to find answers to questions, and even to make purchases.

197.    Other search tools and sources of information are not reasonable substitutes for general search services. Books, publisher websites, social media platforms, and even specialized search providers such as Amazon, Expedia, or Yelp, do not offer consumers the scope of information or convenience that is provided by a general search engine. These other resources do not respond to all types of consumer queries. Few consumers would find alternative sources a suitable substitute for general search services. As a result, there are no reasonable substitutes for general search services, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

198.    The United States is a relevant geographic market for general search services. Google's services are optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes for general search services offered in the United States. Google analyzes search market shares by country, including the United States. Therefore, the United States is a relevant geographic market.

2.    <u>Search Advertising in the United States Is a Relevant Product and</u>
<u>Geographic Market</u>

199.    Search advertising in the United States is a relevant antitrust market. The search advertising market consists of all types of ads generated in response to online search queries, including general search text ads (offered by general search engines such as Google and Bing) and other, specialized search ads (offered by general search engines and specialized search providers such as Amazon, Expedia, or Yelp).

200.    Search ads enable advertisers to target potential customers based on keywords entered by these users, at the exact moment users express interest in the topic of the queries. For this reason, search ads are closer to the consumer's ultimate intent to make a purchase than are other types of ads that are primarily intended to drive brand awareness. The ability of search ads to provide advertising based on a consumer's disclosed  interests, at the instant when the consumer is actively seeking information, makes search ads uniquely valuable to advertisers and distinguishes them from other types of advertising that cannot be similarly targeted.

201.    Other forms of advertising are not reasonably substitutable for search ads. Other advertising as with newspapers, billboards, TV, and radio cannot be targeted at a specific consumer based on the consumer's real-time, disclosed interests. Other forms of online ads, such as display ads or social media ads, do not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase.

202.    Few advertisers would find alternative sources a suitable substitute for search advertising. Because there are no reasonable substitutes for search advertising, a search advertising monopolist would be able to maintain prices above the level that would prevail in a competitive market.

203.    The United States is a relevant geographic market for the search advertising market since Google offers advertisers the ability to target and deliver ads based on the location of consumers in the United States.  Google search is customized for particular countries such as the United States. Google also separately tracks revenue for the United States.

<u>Anticompetitive Effects of the Google and Apple Combination and Conspiracy to Monopolize the Search and Search Advertising Markets</u>

204.    Google and Apple have maintained unlawful monopolies in the general search services and search advertising markets through their exclusionary agreements and by other conduct that have separately and collectively harmed competition by:

a. Substantially foreclosing competition in general search services and insulating search queries in the United States against any meaningful competition;

b. Agreeing not to compete with one another in general search services and for search advertising.

205.    By restricting competition in general search services, Google's and Apple's conduct has harmed consumers of search services by reducing the quality of general search, lessening choice in general search services, and impeding innovation.

206.    Google's and Apple's exclusionary conduct has also substantially foreclosed competition in the search advertising market and has harmed advertisers such as Plaintiff. By suppressing competition in order to be able to charge advertisers more than it could in a competitive market. Google can also reduce the quality of the services it provides to advertisers.

207.    Google's and Apple's conduct has also harmed competition by impeding the distribution of innovative apps that offer search features that would otherwise challenge

Google. Google and Apple have also harmed competition by raising rivals' costs and foreclosing them from effective distribution channels, preventing them from meaningfully challenging Google's monopoly in general search services and in search advertising.

208.    Absent Google's and Apple's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased consumer choice, and a more beneficial user experience. In addition, more competitive search advertising markets would allow advertisers to purchase ads at more attractive rates, with better quality and service. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and higher consumer welfare overall.

209.    The anticompetitive effects flowing from Google's and Apple's agreements, particularly when considered collectively, have allowed Google to develop and maintain monopolies in the markets for general search services and search advertising.  These anticompetitive effects outweigh any benefits from those agreements, or those benefits could be accomplished by less restrictive means.

Standing

210.    Plaintiff has standing to bring this action under Sections 1 and 2 of the Sherman Act.  Plaintiff CCS is in the business of providing crane operator education and testing services. Plaintiff advertises on the Google search platform. This advertising is Plaintiff's primary means of obtaining crane school customers. Plaintiff pays one of the highest "per click" rates to Google for this advertising, amounting to thousands of dollars per year in Google ad fees.  Similar "click through" advertising is less productive on other search engines due to their minimal market penetration.  Because of Google's monopoly power and because of the nefarious, illegal written and oral agreements with Apple to stay out of the

search advertising market, there are fewer viable, less expensive competitive alternatives available to Plaintiff to place advertising and thereby to obtain customers.

211.   The relevant market in this case is the market for search engine advertising. CCS buys advertising on Google in order to have potential students find its crane training services.  The market in which CCS participates directly is the search advertising market. CCS does not do searches.  Rather, CCS seeks to attract business from those who use the search services that Google and Apple and their conspiracy restrict.

212.   Google in turn makes its money from adds placed on its search engine. The searches are free but Google's dominance in the search market gives it the power to control the price of search advertising that it will charge to advertisers seeking the eyes of the searchers since these markets work as hand in glove.  The revenue Google generates comes from ads that searchers are exposed to while engaging in their search.

<u>Federal Class Action Allegations</u>

213.   Plaintiff brings this action under Federal Rule of Civil Procedure Rule 23, on behalf of itself and a class defined as follows:

> All consumers and businesses who paid Google to place advertising on Google search in the United States since January 1, 2005, to and including class certification herein. Excluded from the class are Defendants, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, and any judge, justice or judicial officer presiding over this matter and members of their immediate family and any jurors.

214.   Class treatment is warranted in this case because:

(a) <u>The number of potential Plaintiff Class members is so numerous that joinder of all members is impracticable</u>.  There are millions of persons and entities throughout the United States who have paid Google to place advertising on Google search.

(b) <u>There are questions of law or fact common to the class</u>.  The questions of law or fact are common to the class since Defendants have agreed that Apple will not compete with Google for search and search advertising business, a *per se* violation of the antitrust laws.  By reason of the violation, Plaintiff and the class have been injured and damaged and are substantially threatened with future common injury and damage.

(c) <u>The claims of the representative parties are typical of the claims of the class</u>.  Every member of the class shares the determination that a division of the market by reason of an agreement not to compete is a *per se* violation of the antitrust laws and has deprived the class of competition in the placement of advertising on search.  Except as to the amount of damages, all other questions of law and fact are common to the class and predominate over any questions affecting only individual members of the class.

(d) <u>The representative parties will fairly and adequately protect the interests of the class</u>.  Plaintiff has engaged counsel experienced and competent in litigation of this type who will adequately represent the class.

<u>Federal Violations Alleged</u>

*First Claim for Relief*
*An Agreement Not to Compete in the Search and Search Advertising Business*
*Section 1 of the Sherman Act*

215.    Plaintiff and the class incorporate the allegations of paragraphs 1 through 214 above and 216-279 below.

216.    Defendants Google and Apple have made and have entered into written and oral agreements that Apple would not compete with Google in the search business and in the search advertising business. In exchange for that agreement, Google paid Apple billions of

dollars;  the Defendants engaged in profit-pooling of the advertising revenues from Google's search business; and Google was granted an exclusive position on Apple's platforms to increase the revenues that would be shared.

217.    Google and Apple have specifically agreed within written and oral contracts, including within revenue sharing agreements and pre-installation agreements, that Apple would not compete with Google in the general search or in the general search advertising markets in the United States.

218.    In exchange for Apple's written commitment not to compete in the search business and in the search advertising market in competition with Google within the written Apple-Google Revenue Sharing Agreement, Google agreed to share its profits from the search business and the search advertising business with Apple and, in addition, to pay Apple extra billions of dollars.  Google and Apple further agreed that Apple would make Google the default search engine on its computers and mobile devices in their written Apple-Google Pre-Installation Agreement which also memorializes in writing their agreement not to compete. Although there is value in being the default browser on Apple's devices, a default browser can always be removed.  The real value to Google that justifies its board of directors' business decision to pay billions in revenue sharing to Apple - as is called for in these written Apple-Google agreements – is, in reality, Apple's written commitment not to compete against Google in the search and search advertising markets.

219.    The Defendants' CEOs met privately and secretly to discuss and confirm these written and oral agreements and personally understood that their agreements were a violation of the antitrust laws.

220.    The effect of these agreements is to eliminate the competition between Google and Apple for search and for advertisers and to suppress competition from other smaller

search competitors such as Bing, Yahoo!, and DuckDuckGo.

221.    Because of Google's and Apple's agreement not to compete and to divide the profits in the search advertising market, advertising prices have been higher, production has been lower, innovation has been suppressed, quality has been less, and consumer choice has been eliminated.

222.    On the other hand, in the absence of the anti-competitive agreements, and if Apple were to compete against Google in search and search advertising as it had previously intended to do, prices would be lower, production would be higher, quality would be higher, the incentives for companies to develop and distribute innovative search products would be restored,  and consumer choice would be preserved.

223.    Google and Apple's agreement to divide the market not to compete for search and not to compete for search advertising is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990).

224.    Google and Apple's agreement to share profits is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  *Citizen Publishing Co. vs. United States*, 394 U.S. 131 (1969).

225.    Google and Apple's agreement to grant preferential treatment to Google on all Apple devices excludes and forecloses competitors from a substantial market and enhances prices to advertisers and is therefore a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

226.    Google's and Apple's anticompetitive agreements have stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model.

227.    Google's and Apple's joint exclusionary conduct also substantially forecloses competition in the general search advertising market, harming advertisers. By suppressing competition, Google has more power to manipulate the quantity of advertising inventory in ways that allow it to charge advertisers more than it could in a competitive market. Google can also reduce the quality of the services it provides to advertisers, including by restricting the information it offers to advertisers about their marketing campaigns.  Apple has voluntarily participated in and profited by agreeing not to compete with Google in the search advertising market and by sharing the profits from Google's monopoly on search advertising.

228.    By restricting competition in general search services, Google's and Apple's conduct has harmed consumers by reducing the quality of general search services (including dimensions such as privacy, data protection, and use of consumer data), by lessening choice in general search services, and by impeding innovation.

229.    Plaintiff and the class have been damaged by Google's and Apple's anticompetitive acts by reason of the overcharge paid by Plaintiff and the class and Google's and Apple's anticompetitive acts have had harmful effects on competition and consumers and the general public.  Absent Google's and Apple's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased consumer choice, and a more beneficial user experience. In addition, more competitors in search advertising would allow advertisers to purchase ads at more attractive terms, with better quality and service. Finally, the incentives and abilities for companies to develop and distribute innovative search products and better search advertising would be encouraged, resulting in more options, better products, and higher consumer welfare overall.

/ / /

/ / /

*Second Claim for Relief*

*Conspiracy to Monopolize*

*Section 2 of the Sherman Act*

230.     Plaintiff and the class incorporate the allegations of paragraphs 1 through 239 above and 131-279 below.

231.     Defendants have entered into a combination and conspiracy to suppress and eliminate actual and potential competition in the search business and to fix high, arbitrary prices in the search advertising business.  The combination of Apple and Google to achieve "Our vision . . . that we work as if we are one company"  results in higher prices, lower quality and the suppression and ultimate suppression of actual and potential competitors, including DuckDuckGo, Yahoo!, and Bing.

232.     Google has monopoly power in the general search market in the United States. Google controls 94% of the search market and all the actual and potential competitors have the remaining 6%.

233.     Google has monopoly power in the search advertising market in the United States. Google's share of the U.S. search advertising market is over 70 percent. This market share understates Google's market power in search advertising because many search-advertising competitors offer only specialized search ads and thus compete with Google only in a limited portion of the market.

234.     Apple has combined with Google to monopolize the search business and the search advertising business by specifically agreeing in written and oral contracts, including through revenue sharing agreements and pre-installation agreements, that Apple would not compete with Google in general search or in search advertising.

235.     In furtherance of that agreement, Google agreed that it would share its profits with Apple, and Apple agreed to include Google as the only search engine in all of Apple's

devices.

236.    Apple and Google further agreed that the CEOs of each of the companies would meet secretly from time to time to confirm and enforce the agreements and the means used to further the agreements.

237.    In combination, Apple and Google have the size and the economic power to be able to and have conspired to fix prices and exclude competition in the search market and in the search advertising market, and in fact do so and have done so.

238.    As they themselves have admitted:  "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo";  and their general counsel's description of their relationship as "coopetition."

239.    Google's and Apple's anticompetitive practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

240.    Plaintiff and the class have been damaged by Google's and Apple's anticompetitive acts by reason of the overcharge for advertising paid by Plaintiff and the class. Google's and Apple's anticompetitive acts have also had harmful effects on competition in general and on consumers and the general public.

State Violations Alleged

*Third Claim for Relief*
*Violation of the California Cartwright Act*
*California Business and Professions Code § 16700, et seq.*

241.    Plaintiff California Crane School, Inc. incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint above, and incorporates and realleges paragraphs 242-279 below and further alleges as follows:

State Class Action Allegations

242.    Plaintiff brings this action on behalf of himself and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following California class:

> All consumers and businesses who paid Google in California to place advertising on Google search in the United States since January 1, 2005, to and including class certification herein. Excluded from the class are Defendants, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, and any judge, justice or judicial officer presiding over this matter and members of their immediate family and any jurors.

243.    This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

A.    The Class is ascertainable and there is a well-defined community of interest among members of the Class;

B.    Based upon the nature of trade and commerce involved and the number of purchasers of Google search advertising in California, Plaintiff believes that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

C.    Plaintiff's claim is typical of Class members' claims because Plaintiff purchased advertising from Defendant Google or its co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

D.    The following common questions of law or fact, among others, exist as to the members of the Classes:

i.    Whether Defendants and one or more co-conspirators formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the cost of search advertising;

*Plaintiff's Second Amended Complaint*

   ii. Whether the combination or conspiracy caused search advertising prices to be higher than they would have been in the absence of Defendants' and the co-conspirators' conduct;

   iii. The operative time period of Defendants' and co-conspirators' combination or conspiracy;

   iv. Whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

   v. The appropriate measure of the amount of damages suffered by the Class; and

   vi. Whether Defendants' conduct violates the States' antitrust laws as alleged in the Third Claim for Relief.

  E. These and other questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

  F. After determination of the predominant common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

  G. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent it and the Class; and

  H. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

absent the availability of class action procedures it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision in a single court.

244.     Defendants Apple and Google and the individual defendants entered into an unlawful agreement in restraint of trade in violation of the California Cartwright Act, California Business and Professions Code, §§ 16700, et seq.

245.     During the Class Period defined in Paragraph 161 of this Second Amended Complaint, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the intrastate trade and commerce as described above in violation of Section 16720, California Business and Professions Code. Each Defendant has acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, search advertising at anti-competitive levels.

246.     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, search advertising.

247.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the

following: (1) fixing, raising, stabilizing, and pegging the rates for search advertising; and (2) allocating among themselves the market for search advertising.

248. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale and marketing of search advertising has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for search advertising sold by Defendant Google have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased search advertising from Google have been deprived of the benefit of free and open competition.

249. Plaintiff and the class have been damaged by Google's and Apple's anticompetitive acts by reason of the overcharge paid by Plaintiff and the class and Google's and Apple's anticompetitive acts have had harmful effects on competition and consumers.

*Fourth Claim for Relief*
*Violation of California Unfair Competition Law*
*California Business and Professions Code § 17200, et seq.*

250. Plaintiff brings the following state claim against Defendants for public injunctive relief for the benefit of the general public as a whole, and not as a class action or as a representative action, to restore competition in the market for search advertising and to restore competition rather than combination as the rule of trade throughout California and indeed throughout the entire United States. Plaintiff has suffered injury in fact and has lost money or property as a result of the unfair competition. By restricting competition in general search services, Google's and Apple's conduct has harmed the general public by reducing the quality of general search services in relation to privacy, data protection, and use of consumer data, by lessening choice in general search services, and by impeding innovation.

251. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint above except for Paragraphs 1, 2, 87-88, and incorporates paragraph 250 above and 252-279 below, except that Plaintiff excludes claims for class action status in paragraphs 213-214 and 242-243.

252. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes in violation of California Business and Professions Code § 17200, et seq.

253. At all times relevant herein, and within the last four years, Defendant Google has marketed, sold, or distributed search advertising in California, and committed and continues to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

254. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code to obtain restitution and disgorgement from Defendants Google LLC, Alphabet, Inc., XXVI Holdings, Inc., Apple, Inc., Tim Cook, Sundar Pichai, and Eric Schmidt, for acts, as alleged herein, that violated Section 17200, *et seq*. of the California Business and Professions Code, commonly known as the Unfair Competition Law (the "UCL").

255. Defendants' conduct as alleged herein violates the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to:

(1) violating Sections 1 and 2 of the Sherman Act and violating Section 16720, et seq., of the California Business and Professions Code, as set forth in the paragraphs above and as more particularly set out as follows:

a.      Apple and Google agreed that Apple would not compete in the search and search advertising business in competition with Google.

b.      In exchange for Apple's commitment not to compete in the search and search advertising business in competition with Google, Google agreed to share its profits from the search business with Apple and, in addition, to pay Apple extra billions of dollars. Google paid Apple to stay out of the search business.

c.      Apple accepted the payments from Google and stayed out of the search and search advertising business.

d.      Apple agreed to assist Google in building its search and search advertising business for their mutual benefit.

e.      Apple agreed that Google would be the only search engine automatically included in all of Apple's devices.

f.      Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and non-Google favored advertisers.

g.      Apple devices account for roughly 60 percent of mobile device usage in the United States.

h.      Apple's Mac OS (operating system) accounts for approximately 25 percent of total computer usage in the United States.

i.      As of September 2020, Google controlled 94 percent of the mobile search engine U.S. market share.  As of September 2020, Google controlled 82 percent of the computer search engine U.S. market share.

j.      By reason of the profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has contributed to Google's dominant position in the search market and in the search advertising market because the more money Google makes in search, the more money Apple makes as a share of Google's advertising revenue under the agreements.

k.      The non-compete agreement, the profit-sharing agreement, and the out-of-the-box preference agreement remove any incentive on the part of Apple to compete against Google in the search business and in the search advertising business.

l.      Apple is the major threat to Google as a potential competitor in the search business and in the search advertising business.  But Apple has agreed with Google that it will not develop nor offer a general search engine in competition with Google.

m.      Google and Apple made an agreement that Apple would not compete with Google in the search business and in the search advertising market. In exchange for that agreement, Google paid Apple billions of dollars;  the Defendants engaged in profit-pooling of the advertising revenues from Google's search business; and Google was granted an exclusive position on Apple's platforms to increase the revenues that would be shared with Apple.

256.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, and in other paragraphs in this Complaint, whether or not in violation of Sections 1 and 2 of the Sherman Act, and whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

257.    Defendants' acts or practices are unfair to consumers and purchasers of search advertising in California within the meaning of Section 17200 of the California Business and Professions Code.

258.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

259.     Plaintiff is entitled to full restitution for all overcharges and Defendants are required to disgorge to the public treasury all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business acts or practices.

260.     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

261.     The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiff to pay artificially inflated prices for search advertising, inter alia. Plaintiff has suffered injury in fact and lost money or property as a result of such unfair competition.

262.     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.

263.     Plaintiff for himself and for the benefit of the public is accordingly entitled to equitable relief including restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204. Such remedies will incentivize innovation, new potential competition, new jobs, more companies, greater consumer choice, greater output and production, expansion of products, increase in demand, and investment opportunities, both in this business and in ancillary businesses that support this industry. Such remedies will serve to substantially increase demand and consumers will have more choices. Absent Google's and Apple's exclusionary agreements and other conduct, dynamic competition for general search services and search advertising would lead to higher quality search, increased user choice, and a more beneficial

user experience and lowered advertising costs. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and higher consumer welfare overall.

264.    Plaintiff brings this cause of action for the benefit of the general public. Plaintiff has alleged that the public relief being sought is not ancillary to compensation to Plaintiff as an advertiser, but rather is being sought for the benefit of the public as a whole because it is being sought to remedy the collapse of competition in the search market and the search advertising market and to restore choice in the marketplace for the benefit, not only of Plaintiff, but of all users of search.

265.    Indeed, the public benefit is and has always been the history and focus of the antitrust laws. *Apex Hosiery Co. v. Leader, et al*., 310 U.S. 469, at p. 493 (1940) (redress of "public injury"); *Perma Life Mufflers v. International Parts Corp*., 392 U.S. 134, at p. 138 (1968) (serves "important public purposes"); *American Safety v McGuire*, 391 F.2d 821, at p. 826 (2dCir 1968) (plaintiff "likened to a private attorney-general who protects the public's interest"); *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100 at p. 131- 133 (1969) ("availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect'" and "treble-damage cases, which are brought for private ends, but which also serve the public interest"); *United States v. TOPCO Associates, Inc*., 405 U.S. 596, at p. 621 (1972) ("the protection of the public welfare . . ." Dissent of Justice Burger); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985) at p. 6334-635 (" 'the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest.' "); *Spectrum Sports, inc. v. McQuillan, et vir*, 506 U.S. 447 at p. 458 (1993) ("The [antitrust] law directs itself . . . against conduct which unfairly tends to

destroy competition itself . . . not out of solicitude for private concerns but out of concern for the public interest.")

*Fifth Claim for Relief*

*Unjust Enrichment*

266.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint above, and incorporates paragraphs 267-279 below, except that Plaintiff excludes claims for class action status in paragraphs 213-214 and 242-243.

267.     Plaintiff asserts the following state law claim on behalf of himself only, and not on behalf of the class, and seeks relief for the general public.

268.     Plaintiff brings this claim under the laws of the state of California.  As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of search advertising in the search advertising market.

269.     Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and others who have purchased search advertising from Defendant Google.

270.     Plaintiff and the public are entitled to disgorgement of the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the public are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the public may make claims on a pro rata basis.

Fraudulent Concealment

271.     As a result of the private and secret meetings between the CEOs of Google and Apple which have taken place since at least 2005 until shortly before the filing of this

Complaint, Plaintiff and members of the Plaintiff Class had no knowledge that Defendants were violating the antitrust laws as alleged herein and had no knowledge of facts that might have led to their discovery. In addition, the Defendants took affirmative steps to conceal their conspiracy in their private and clandestine meetings and by keeping their written agreements secret.

272. Plaintiff and the members of the class could not have discovered Defendants' violations at any time prior to this date by the exercise of due diligence because of the fraudulent and active concealment of the conspiracy by Defendants through various means and methods designed to avoid detection.

273. Defendants secretly conducted meetings and made agreements in furtherance of the conspiracy, confined such information concerning the conspiracy to key officials, and engaged in conduct creating an estoppel to assert the statute of limitations, all of which constitute a ground for revocation of contract under California Civil Code section 1689.

274. In addition, Defendant Google's "Google Inc. Advertising Program Terms" "contract" (hereinafter "GIAPT") with Plaintiff was obtained through the concealment and suppression of material facts that Google was bound to disclose. Google has waived enforcement of the arbitration clause in its GIAPT by the filing of a motion to dismiss in this case. Moreover, Plaintiff did not consent to arbitration nor was there a meeting of the minds by reason of the ambiguities inherent in the GIAPT, by reason of Plaintiff's mistake of material fact and by reason of Google's concealment of material facts. *Moncharsh vs. Heily & Blasé*, 3 Cal.4th 1 (1992). The GIAPT is an adhesion contract that Plaintiff had no choice but to follow because Google is a monopoly controlling 94% of the mobile search advertising market. Had Plaintiff not acceded, Plaintiff would have been foreclosed from 94% of the mobile search advertising market.

1

2

<u>Request for Relief</u>

3

<u>For The Benefit of Plaintiff and for The Federal and State Classes</u>

4

275.    To remedy these illegal acts, Plaintiff and the Class request that the Court grant

5

them the following relief:

6

a.    Adjudge, decree, and declare void  that the alleged contract,

7

combination and conspiracy between Google and Apple that Apple does not compete with

8

Google in the search business and in the search advertising business and to divide the search

9

10

business are illegal combinations and conspiracies in violation of Section 1 of the Sherman

11

Act;

12

b.    Adjudge, decree, and declare void that the alleged contract,

13

combination and conspiracy between Google and Apple to pool or share profits in the search

14

advertising business are illegal combinations and conspiracies in violation of Section 1 of the

15

Sherman Act;

16

17

c.    Adjudge, decree, and declare void that the alleged contract,

18

combination and conspiracy between Google and Apple to give preferential search positions

19

to Google in Apple devices are illegal combinations and conspiracies in violation of Section 1

20

of the Sherman Act;

21

d.    Adjudge, decree, and declare that the alleged contract, combination and

22

conspiracy between Google and Apple that Apple does not compete with Google in the search

23

business and search advertising business, to divide the search business, to share profits of the

24

search advertising business, and to give preferential search positions to Google on Apple

25

devices are, taken together, illegal combinations and conspiracies in violation of Section 1 of

26

the Sherman Act;

27

28

e.      Adjudge, decree, and declare void that the alleged contract, combination and conspiracy between Google and Apple (1) that Apple not compete with Google in the search business and in the search advertising market; (2) that Apple and Google share the profits of Google's search advertising business;  (3) that Apple give Google preferential search position in Apple devices; and (4) that Google and Apple maintain control of 94% of the search business, with the power to fix prices and exclude competition, and in fact do so, are illegal combinations and conspiracies to monopolize in violation of Section 2 of the Sherman Act;

f.      Enter judgment in favor of Plaintiff CALIFORNIA CRANE SCHOOL INC. and the class and against Defendant Apple and award Plaintiff and the class threefold the damages sustained by them according to law and award Plaintiff and the class their reasonable attorneys' fees and costs, and any pre-judgment and post-judgment interest as permitted by law; and

g.      Enter any additional relief for Plaintiff and the class that the Court finds just and proper.

<u>Forward-Looking Public Injunctive Relief for Benefit of</u>

<u>The General Public as A Whole</u>

276.    For the benefit of the general public as a whole, that the Court:

a.      Enjoin Defendants from future agreements that Apple does not compete with Google in the search business and to divide the search advertising business; from future agreements to share or pool profits; from future agreements to provide Google with exclusive search privileges on Apple devices; and from future agreements to meet for the purpose of discussing anticompetitive conduct;

b.      Enjoin and prohibit Defendant Cook and Defendant Pichai from

making future agreements that Apple does not compete with Google in the search business and to divide the search advertising business; from making future agreements for Google to share or pool profits with Apple; from making future agreements to provide Google with exclusive search privileges on Apple devices; and from making future agreements to meet for the purpose of discussing such anticompetitive conduct.

<u>Disgorgement</u>

c.      For the benefit of the general public as a whole**,** that the Court require Apple to disgorge all unlawful revenue derived from the agreement to share revenue with Google, and disgorge all payments made by Google to Apple, on the grounds that these payments and profit sharing are illegal and unlawful and must be disgorged so that neither Defendant may not profit from their wrongdoing, and so that all of these illegal and unlawful gains, once disgorged, shall be distributed by the Court in its discretion, including to the public treasury;

d.      For the benefit of the general public as a whole**,** that the Court require Apple to disgorge all payments, plus interest from the first payment, made by Google to Apple so that Google and Apple will be precluded from using those funds in the future as capital available to fund or promote any future pooling or sharing of profits by Google with Apple.

e.      For the benefit of the general public as a whole, that the Court require Apple to disgorge all payments, plus interest from the first payment, made by Google to Apple so that Google and Apple will be precluded from using those funds in the future as capital available to fund or promote future exclusive out-of-the-box access by Google to Apple's devices.

f.      For the benefit of the general public as a whole, that the Court enter any other preliminary or permanent relief necessary and appropriate to restore competitive

conditions in the search business affected by Google and Apple's unlawful conduct to

preclude Google and Apple from engaging in the anticompetitive conduct alleged herein in the

future.

Divestiture

        g.      For the future benefit of the public as a whole, that the Court effect a

forward-looking divestiture of the anticompetitive business structures that Google and Apple

have erected and abused, by dividing Google into separate and independent companies and by

dividing Apple into separate and independent companies to reestablish competition in general

search and general search advertising in the future, just as was necessary to reestablish

competition in the oil industry, when, in *United States. v. Standard Oil Co. of New Jersey*, 221

U.S. 1 (1911), Standard Oil was divided by the Court into separate and independent

companies:

> "…the application of remedies two-fold in character becomes essential: 1st. To
> forbid the doing in the future of acts like those which we have found to have been done
> in the past which would be violative of the statute. 2d. The exertion of such
> measure of relief as will effectually dissolve the combination found to exist in
> violation of the statute, and thus neutralize the extension and continually operating
> force which the possession of the power unlawfully obtained has brought and will
> continue to bring about." *Id*. at 78.

        h.      For the future benefit of the general public as a whole, that the Court

enter any other future injunctive relief necessary and appropriate to restore competitive

conditions in the search business and in the search advertising business now being affected by

Google and Apple's unlawful conduct;

        i.      For the future benefit of the general public as a whole, that the Court

enter any other future injunctive relief for the benefit of the general public as a whole that the

Court finds just and proper.

1

2

<u>Relief for Violations of Sherman Act and</u>

<u>California Cartwright Act</u>

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

277.    That Plaintiff and members of the class in the federal antitrust claims and in the Cartwright Act claims recover damages in the amount of the overcharges sustained by reason of Defendants' anticompetitive conduct, and, to the maximum extent allowed by such laws, that Plaintiff and the class and the public be awarded restitution and disgorgement of the payments received by Apple from Google and the profits received by Apple in sharing revenue with Google.  And, for the benefit of the public, that the disgorged amounts be paid to the public treasury.  Such remedies will incite innovation and create new and potential competition, new jobs, more companies, greater consumer choice, greater output and production, expansion of products, increase in demand, and investment opportunities, both in this business and in ancillary businesses that support this industry.  Such remedies will serve to substantially increase demand and provide more choices for consumers.  Absent Google's and Apple's exclusionary agreements and other anti-competitive conduct, dynamic competition for general search services and in the search advertising market will lead to higher quality search, increased user choice, a more beneficial user experience and lowered advertising costs.  Finally, the incentives for and abilities of companies to develop and distribute innovative search products will be restored, resulting in more options, better products, and higher consumer welfare overall.

23

24

<u>Relief for Violations of Fourth and Fifth Causes of Action:</u>
<u>California UCL and Unjust Enrichment</u>

25

26

27

28

278.    That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or

combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

279.    That Plaintiff and members of the public be awarded restitution and disgorgement of profits that Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment.  Such remedies will incite innovation and create new and potential competition, new jobs, more companies, greater consumer choice, greater output and production, expansion of products, increase in demand, and investment opportunities, both in the general search and search advertising business and in ancillary businesses that support this industry.  Such remedies will serve to substantially increase demand and provide more choices for consumers.  Absent Google's and Apple's exclusionary agreements and other anti-competitive conduct, dynamic competition for general search services and search advertising will lead to higher quality search, increased user choice, a more beneficial user experience and lowered advertising costs.  Finally, the incentives for and abilities of companies to develop and distribute innovative search products will be restored, resulting in more options, better products, and higher consumer welfare overall.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

Dated:  May 26, 2023                          ALIOTO LAW FIRM


By:  /s/ *Joseph M. Alioto*
       Joseph M. Alioto (SBN 42680)
       Tatiana V. Wallace (SBN 233939)
       One Sansome Street, Suite 3500
       San Francisco, CA  94104
       Telephone: (415) 434-8900

1

ADDITIONAL PLAINTIFFS COUNSEL:

2

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G.
PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Robert J. Bonsignore (SBN
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

3

4

5

6

7

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE PC
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmoore@aliotolaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

8

9

10

11

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H. WINTERS
388 Market St. Suite 1300
San Francisco, California 94111
Telephone: (415) 398-2941
Email: sawmill2@aol.com

12

13

14

15

16

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

17

18

19

20

21

22

23

24

25

26

27

28