1 Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
2 ALIOTO LAW FIRM
One Sansome Street, 35th Floor
3 San Francisco, CA  94104
Telephone:  (415) 434-8900
4 Email:  jmalioto@aliotolaw.com

5

6 [Additional Counsel Listed on Last Page]

7

8 **UNITED STATES DISTRICT COURT**

9 **NORTHERN DISTRICT OF CALIFORNIA**

10

11 CALIFORNIA CRANE SCHOOL, INC.,

12 on behalf of itself and all others similarly
situated,

13
                              Plaintiff,
14
vs.
15
GOOGLE LLC, ALPHABET, INC., XXVI
16 HOLDINGS, INC., APPLE, INC., TIM
COOK, SUNDAR PICHAI, and ERIC
17 SCHMIDT,

18
                              Defendants.
19

20

Case No:  3:21-cv-10001 AMO


**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

Date:        November 16, 2023
Time:        2:00 p.m.
Place:       Courtroom 10, 19th Floor
Judge:       Hon. Araceli Martinez-Olguin

21

22

23

24

25

26

27

28

*Plaintiffs Opposition to Defendants' Motion to Dismiss Second Amended Complaint*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

I.   PLAINTIFF HAS SPECIFICALLY AND IN DETAIL ALLEGED A PRIMA FACIE CONTRACT, COMBINATION AND CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................................................1

    A.   An Agreement Not to Compete is a Per Se Violation of the Sherman Act................................................................................................................1

    B.   Plaintiff Has Alleged That Google Has Paid Apple Billions of Dollars in Revenue and Profit Sharing ................................................................5

    C.   Apple Is a Potential Horizontal Competitor of Google ...........................9

    D.   The Inference of Conspiracy....................................................................10

    E.   Google's Default Position on Apple Devices Gives Google an Anticompetitive Advantage Over its Competitors That is Supported by Apple.........................................................................................................13

II.  THE SECOND AMENDED COMPLAINT ALLEGES A CONSPIRACY TO MONOPOLIZE UNDER SECTION 2 OF THE SHERMAN ACT ...............................14

    A.   General Search Services is a Relevant Antitrust Market .......................18

    B.   General Search Advertising is a Relevant Antitrust Market...................18

    C.   Anticompetitive Effect and Standing of Plaintiff ..................................19

    D.   Antitrust Injury .......................................................................................19

III. PLAINTIFF'S STATE LAW ANTITRUST CLAIMS SHOULD NOT BE DISMISSED ...................................................................................................................21

IV.  THE INDIVIDUAL DEFENDANTS SHOULD NOT BE DISMISSED ......................22

V.   THE STATUTE OF LIMITATONS IS NOT A BAR TO ACTS OCCURING PRIOR TO FOUR YEARS FROM FILING ....................................................................23

VI.  DISGORGEMENT OF GOOGLE'S PAYMENTS TO APPLE IS AUTHORIZED BY SECTION 16 OF THE CLAYTON ACT .........................................23

*Plaintiffs Opposition to Defendants' Motion to Dismiss Second Amended Complaint*

i

VII.   IF NECESSARY, LEAVE TO AMEND AND FOR DISCOVERY IS
APPROPRIATE...........................................................................................................24

CONCLUSION..................................................................................................................24

1

## **TABLE TO AUTHORITIES**

2

**CASES**

3

*Paladin Assocs., Inc. v. Montana Power, Co*., 328 F.3d 1145, 1158 (9th Cir. 2003) .............. 16

4

*American Tobacco Co. v. U. S.,* 328 U.S. 781, 801-810 (1946)........................................... 12,26

5

*Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 457 U.S. 344 n. 15 (1982) ......... 3

6

*Ashcroft v. Iqbal*, 556 U. S. 662 (2009) .................................................................................... 6

7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 6

8

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)...................................................... 22

9

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) ........... 23

10

*Cianci v. Super. Ct.*, 40 Cal. 3d 903, 920 (1985)...................................................................... 23

11

*Citizen Publishing Co. vs. United States*, 394 U.S. 131 (1969 ................................................ 1,2

12

*Esco Corporation v. United States*, 340 F.2d 1000 (9th Cir. 1965) .......................................... 13

13

*Garrison v. Oracle Corp*., 159 F. Supp. 3d 1044, 1073 (N.D. Cal.2016) ............................... 24

14

*Hexel Corp. Ineos Polymers Inc*., 681 F.3d 1055, 1060 (9th Cir. 2012).................................. 24

15

*In re SRAM Antitrust Litig*., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)................................ 19

16

*International Salt Co. v. United States*, 332 U.S. 392, 396 (1947) .......................................... 15

17

*Kendall v Visa U.S.A., Inc.*, 518 F.3d. 1042, 1046 (9th Cir. 2008) ......................................... 25

18

*Knutson v. Daily Review, Inc.* 548 F.2d 795 (9th Cir. 1976).................................................... 26

19

*Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936, 1942 (2020............................ 25

20

*Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990 ............................................................. 3,11

21

*Story Parchment Co. v. Patterson Paper Parchment Co.*, 282 U.S. 555 (1931)...................... 21

22

*United States v. Apple, Inc*., 791 F.3d 290 (2d Cir. 2015)....................................................... 18

23

*United States v. Griffith, 334 U.S. 100, at 107 (1948)*............................................................. 17

24

*United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940 .............................................. 24

25

*United States v. Swift & Co., 286 U.S. 106, 116*...................................................................... 18

26

27

28

*United States v. Topco Associates*, 405 U.S. 596, 610 (1972)................................................... 1,3

**STATUTES**

Sections 4 of the Clayton Antitrust Act (15 U.S.C. §§15, 26)...................................................... 1

Sections 16 of the Clayton Antitrust Act (15 U.S.C. §§15, 26)................................................... 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>INTRODUCTION</u>**

This is a private antitrust suit brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§15, 26) for injury and damage caused by and for injunctive relief made necessary by the Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, and, separately, for the disgorgement of the unlawful payments by Google to Apple in an amount to be determined by the jury, to be distributed in the discretion of the Court, to either the public at large or to the Treasury of the United States.

The facts alleged in the Second Amended Complaint ("SAC") establish *per se* violations of Section 1 of the Sherman Act, including the division of markets and agreement not to compete (*United States v. Topco Associates*, 405 U.S. 596, 610 (1972; *Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990)); profit pooling (*Citizen Publishing Co. vs. United States*, 394 U.S. 131 (1969); foreclosure of competitors from substantial market (*International Salt Co. v. United States*, 332 U.S. 392 (1947) and violations of Section 2 of the Sherman Act for conspiracy to monopolize the market in search advertising.

I.    **PLAINTIFF HAS SPECIFICALLY AND IN DETAIL ALLEGED A PRIMA FACIE CONTRACT, COMBINATION AND CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

Section 1 of the Sherman Antitrust Act provides, in relevant part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

Profit sharing agreements and agreements not to compete and to divide markets are *per se* illegal under the Sherman Act.

**A.  An Agreement Not to Compete is a *Per Se* Violation of the Sherman Act**

In *Citizen Publishing Co. vs. United States*, 394 U.S. 131 (1969) two newspapers, the Star and the Citizen were sued by the government for entering into a joint operating agreement whereby competitive rates were set, profits were pooled and divided, and the newspapers agreed not to compete.  The U.S. Supreme Court affirmed the district court's grant of summary judgment in favor of the government on the ground that this agreement was a *per se* violation of section 1 of the Sherman Act.  Quoting from the Court's opinion at pages 134-135:

> "The purpose of the agreement was to end any business or commercial competition between the two papers and to that end three types of controls were imposed. First was price fixing. The newspapers were sold and distributed by the circulation department of TNI; commercial advertising placed in the papers was sold only by the advertising department of TNI; the subscription and advertising rates were set jointly. Second was profit pooling. All profits realized were pooled and distributed to the Star and the Citizen by TNI pursuant to an agreed ratio. Third was a market control. It was agreed that neither the Star nor the Citizen nor any of their stockholders, officers, and executives would engage in any other business in Pima County—the metropolitan area of Tucson—in conflict with the agreement. Thus, competing publishing operations were foreclosed.

> "All commercial rivalry between the papers ceased. . . .

> "The Government's complaint charged an unreasonable restraint of trade or commerce in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, and a monopoly in violation of § 2, 15 U. S. C. § 2. The District Court, after finding that the joint operating agreement contained provisions which were unlawful per se under § 1, granted the Government's motion for summary judgment." (*Citizen Publishing,* p. 134-135.*)*

The Court affirmed the judgment stating at p. 136:

> "The § 1 violations are plain beyond peradventure. Price-fixing is illegal per se. *United States v. Masonite Corp., 316 U. S. 265, 276.* Pooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act. *Northern Securities Co. v. United States, 193 U. S. 197, 328*. The agreement not to engage in any other publishing business in Pima County was a division of fields also banned by the Act. *Timken Co. v. United States,*   341 U. S. 593. The joint operating agreement exposed the restraints so clearly and unambiguously as to justify the rather rare use of a summary judgment in the antitrust field.  *Northern Pac. R. Co. v. United States,* 356 U. S. 1, 5.

And in *Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990), competitors HBJ and BRG were providers of bar review courses who entered into a revenue-sharing agreement under which HBJ agreed not to compete in Georgia and BRG would not compete with HBJ outside of Florida.  Citing *United States v. Topco Associates, Inc.,* 405 U.S. 596 (1972), the Supreme Court reversed the grant of summary judgment to defendants and held that horizontal market allocation agreements are *per se* violations of Section 1 of the Sherman Act and are "anticompetitive regardless of whether the parties split a market within which they both do business or whether they merely reserve one market for one and another for the other. 498 U.S. 50 [footnote 6, *See Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 344 n. 15 (1982)] ("division of markets" is a *per se* offense).

Both of these Supreme Court opinions in *Citizens Publishing* and in *Palmer* demonstrate clearly and succinctly just how the Defendants' conduct, as alleged by Plaintiff in this case, is a per se violation of the law.

Plaintiff has alleged both a horizontal market allocation agreement between Apple and Google and a revenue sharing agreement, both of which are illegal under *Palmer* and *Citizen Publishing*.  Plaintiff has specifically alleged that Apple and Google have agreed in writing that Apple will not compete against Google in the search advertising market (agreement not to compete, market allocation). In exchange for Apple's agreement, Plaintiff has specifically alleged that Google has agreed in writing that it will pay Apple a share of its revenue and profits from search advertising (profit pooling).  Indeed, this agreement has been admitted by Google.   Plaintiff has alleged that, before the Defendants entered into their written agreement not to compete, to allocate markets and to share in the profits and revenues of search advertising, Apple was developing its own search engine in competition with Google.  After

entering into the agreement with Google, Apple abandoned its plans to develop a search engine and to enter the search advertising market because, based upon its agreement with Google, it could enjoy the profits of search advertising without having to compete in the market.  Plaintiff has alleged that Apple actively worked to promote Google by making Google its default browser because, the more money that Google made in search advertising, the more money Apple made under its revenue sharing agreement with Google. Plaintiff has alleged that Google has paid Apple over 50 billions of dollars since 2005.  (SAC, Paras. 60-69, 70.)  Plaintiff has specifically alleged that the effect of these agreements is to reduce and eliminate the incentive to compete with one another.  Plaintiff has alleged that the quid pro quo for Apple's agreement not to compete is that Google must pay Apple billions of dollars to stay out of the market and to favor Google over other search engines by pre-installing Google on its machines, thereby effectively foreclosing all other potential competitors.  The arrangement works well for Apple since the more money that Google makes in search, the more money Apple will make from Google. (SAC, Paras. 9-13, 18-31.) The arrangement completely removes Apple's incentive to compete.  (SAC, Para 152.)  Apple has been paid for the profits it would otherwise have made if it had competed with Google without having to suffer the expense and trouble of doing so.  By reason of the profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has contributed to Google's dominant position in the search market and the search advertising market because the more money Google makes in search, the more money Apple makes under the agreements.  (SAC, Para 150-151.)

The anticompetitive effects, as alleged in the SAC, that result from these violations are manifest:  prices are higher, production is lower, competition is eliminated, innovation is

stifled, quality is diminished, advertisers have paid more for search advertising than they otherwise would pay, and consumer choice is eliminated. (SAC, Paras. 221-222.)

The SAC has alleged the "contract, combination, and conspiracy" in detail, both in terms of the *actual written agreement* between the Defendants, and the further combination and conspiracy through *clandestine meetings* and *oral agreements* of the CEOs to maintain and continue the unlawful agreement.

### B.  Plaintiff Has Alleged That Google Has Paid Apple Billions of Dollars in Revenue and Profit Sharing

Under *Citizen Publishing* and *Palmer*, the revenue-sharing agreement between Google and Apple, publicly admitted by the Defendants, is a prima facie *per se* violation of section 1 of the Sherman Act.  The very existence of the publicly admitted revenue-sharing agreement between Google and Apple, itself satisfies the plausibility standard of *Ashcroft v. Iqbal*, 556 U. S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Plaintiff has alleged specific and detailed facts demonstrating that Google has agreed in writing to make payments to Apple in the billions of dollars each year in order to become the exclusive default search engine on Apple's computers, iPads and iPhones in exchange for Apple's agreement that Apple will not compete against Google in the search advertising business. (SAC, Paras. 9-13, 18-31, 60-72.) These allegations of contract, combination and agreement, when proved, will result in a finding that Defendants have violated Section 1 of the Sherman Act.

- The Defendants, both Apple and Google, agreed in various writings, including in their *written* Revenue Sharing Agreement and in their *written* Pre-Installation Agreement, *that Apple would not compete in the search business and in the search advertising market in competition with Google*. (SAC, Paras. 5-17, 24-25.)

- In exchange for Apple's commitment not to compete in the search business in competition with Google, Google agreed *in writing* to share its profits from the

search business with Apple and, in addition, to pay Apple extra billions of dollars. (SAC, Paras. 18-26.)

- Apple agreed to assist Google in building its search business for their mutual benefit. (SAC, Para. 27.)

- For Google to be able to generate sufficient billions of dollars to pay to Apple for its agreement not to compete, Apple agreed that Google would be the only search engine automatically included in all of Apple's devices. (SAC, Para. 28.)

- Apple's *written* agreement to include Google as the initial search engine on all of Apple's devices gives Google a substantial and unfair anticompetitive advantage over other search providers, actual and potential, including Yahoo!, DuckDuckGo, Bing, and others. (SAC, Para. 29.)

- Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and non-Google favored advertisers. (SAC, Para. 30.)

- These written agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Officers and Chairmen of Apple and Google. (SAC, Para. 18-26, 34-37, 79, 155-156, 181.)

- The architects of the combination during the early 2000's were Steve Jobs, the CEO and Chairman of Apple, and Eric Schmidt, the CEO and Chairman of Google. (SAC, Para. 32.)

- More recently, the continued combination to eliminate competition between Apple and Google has been re-affirmed by Tim Cook, the CEO of Apple, and Sundar Pichai, CEO and Chairman of Google. (SAC, Para. 33.)

- The meetings between the CEOs and Chairmen of Apple and Google were clandestine in order to fraudulently conceal their agreements not to compete in the search business and the search advertising market.  (SAC, Paras. 18-26, 34-37, 79, 155-156, 181.)

- Some of the secret meetings have been photographed and taped by bystanders who chanced to notice the conspirators meeting together. (SAC, Para. 18-26, 34-37, 79, 155-156, 181.)

- These meetings were undertaken to promote the shared vision that Apple and Google would act, in effect, as one company that was merged without merging. Apple and Google invented the word "co-opetitive" to describe their unlawful combination and conspiracy. (SAC, Para. 37, 181.)

- The CEOs and Chairmen of the Defendants knew and understood that their agreements were illegal under the Antitrust Laws of the United States. The CEOs and Chairmen had been advised that their agreement to divide the markets for search and search advertising would violate the antitrust laws. (SAC, Para. 38.)

- The overall purpose of the Defendants' agreement was to eliminate the potential competition of Apple from entering the search business and the search advertising market.  (SAC, Para. 40.)

- In furtherance of the unlawful agreement, the Defendants engaged in the following acts and means, among others, to ensure the success of the agreement:
    a. secret meetings between the CEOs;
    b. revenue-sharing and profit-pooling;
    c. payment of billions of dollars every year by Google to Apple;
    d. automatic inclusion of Google search on Apple devices, to the exclusion of other search companies, and non-Google favored advertisers;
    e. *written agreements* that Apple would not compete in search and search advertising;
    f. *oral agreements* that Apple would not compete in search and search advertising;
    g. the recognition and agreement that the more Google made the more Apple made; and
    h. the elimination of Apple as a potential competitor in the search business and in the search advertising business.
    (SAC, Para. 41.)

- More than half of Google's search business was conducted using Apple devices. (SAC, Para. 42.)

- Because more than half of Google's search business came through Apple devices, Apple was a major potential threat to Google to build its own search and search advertising business, and that threat was designated by Google as "Code Red." (SAC, Para. 43, 45.)

- Google agreed to share its revenue and profits with Apple and paid Apple billions of dollars to eliminate the threat and fear that Apple may become a competitor. (SAC, Para. 44.)

- If Apple became a competitor in the search business and search advertising business, Google would have lost half of its business. (SAC, Para. 46.)

- Google, as of September 2020, controlled 94% of the *mobile* search engine U.S. market share.  (SAC, Para. 47.)

- Google, as of September 2020, controlled 82% of the *computer* search engine U.S. market share.  (SAC, Para. 48.)

- For the last 10 years, from 2009 to 2019, Google increased its control of the search engine U.S. market share from 80% to 88%.  (SAC, Para. 49.)

- From 2005 up to and including the time of the filing of this complaint, Google paid Apple more than $50 billion to stay out of the search business and search advertising business. (SAC, Paras. 60-69, 70.)

- Since 2005, Google has agreed to share billions of dollars of advertising revenue with Apple each year in consideration for Apple's commitment not to compete in the search market and the search advertising market.  (SAC, Para. 148.)

- Since 2005, Google has become the primary out of the box exclusive search engine on Apple's Safari Browser on its Mac computer, and, since 2007, on Apple's iPhone.  (SAC, Para. 149.)

- Apple accepted the payments from Google and stayed out of the search business and search advertising business. (SAC, Paras. 71-72.)

- Apple promoted Google in the search business and search advertising business over other search providers and non-favored advertisers. (SAC, Para. 73.)

- Google has "locked up" distribution of its search engine through exclusionary contracts with Apple. (SAC, Paras. 74-85.)

- Apple and Google have the motive, the opportunity by their meetings, and the ability to control the search business, to share in the profits from the search advertising business, and to eliminate the potential competition of Apple.  (SAC, Paras. 86-87.)

- Currently Google's profit-sharing agreements with Apple give Google an exclusive preset position on all significant search access points on Apple computers and mobile devices.  (SAC, Para. 147.)

- Apple and Google believe they are one company: "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo".  Their general counsel described the reality of their combination as "co-opetition."  (SAC, Para. 238.)

- The non-compete agreement, the profit-sharing agreement, and the out-of-the-box preference agreement have removed any incentive on the part of Apple to compete against Google in the search business and in the search advertising market.  (SAC, Para. 152.)

The following allegations specifically enumerate the effects of this combination:

*Plaintiffs Opposition to Defendants' Motion to Dismiss Second Amended Complaint*

- Google charges higher prices to advertisers than would otherwise be the case in the absence of the Google-Apple agreements. (SAC, Para. 50.)

- By reason of the agreement between Apple and Google, the prices, the production, the innovation, and the quality of the overall search business has been substantially, adversely, and anticompetitively affected. (SAC, Para. 58.)

- Because of Google and Apple's agreement not to compete and to divide the market, prices have been higher, production has been lower, innovation has been suppressed, quality has been lessened, and consumer choice has been eliminated. (SAC, Para. 221.)

- Google's and Apple's anticompetitive agreements have stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model.  (SAC, Para. 226.)

- Google's and Apple's joint exclusionary conduct also substantially forecloses competition in the search advertising and general text search advertising markets, harming advertisers. . . (SAC, Para. 227.)

- By restricting competition in general search services, Google's and Apple's conduct has harmed consumers by reducing the quality of general search services (including important features and aspects of search such as privacy, data protection, and use of consumer data), by lessening choice for providers of general search services, and by impeding innovation. (SAC, Para. 228.)

- Google's anticompetitive acts have had harmful effects on both competition and consumers. . .  (SAC, Para. 229.)

**C.  Apple Is a Potential Horizontal Competitor of Google**

The Second Amended Complaint alleges a horizontal relationship between Google as a competitor in the search and search advertising business paying Apple, as a potential competitor, billions of dollars per year in admitted and publicly reported revenue sharing. Specifically, the SAC alleges as follows:

- In the past, Apple had actively worked on developing its own general search engine as a potential competitor to Google.  As a result, Apple is a potential direct competitor of Google in the search business and potentially threatens Google's dominance in the search advertising business but for its agreement not to compete with Google and to share profits with Google.  (SAC, Paras.162-166.)

- It has been estimated that if Apple were to launch its own search engine in competition with Google, at least $15 billion a year of Google revenue would go to Apple.  (SAC, Para. 167.)

- Apple is the major threat to Google as a potential competitor in the search business and in the search advertising market.  (SAC, Para. 168.)

- By paying billions of dollars to Apple each year, Google has locked in Apple's commitment not to compete in search.  (SAC, Para. 175.)

- It was reported that as late as 2014 Apple had been working on its own search engine.  However, Apple opted to receive the payment of billions of dollars from Google instead of competing with Google.  (SAC, Para. 187.)

- Apple has agreed with Google that it will not develop nor offer a general search engine in competition with Google.  (SAC, Para. 171.)

Thus, the SAC alleges a horizontal relationship between Google as a potential competitor in the search and search advertising business paying Apple, as a potential competitor, billions of dollars per year in admitted revenue sharing. Such horizontal revenue sharing between Google as a competitor and Apple as a potential competitor constitutes a *per se* violation of Section 1 of the Sherman Act.  *Citizen Publishing Company v. United States*, *supra* at 135-136 (1969); *Palmer v. BRG of Georgia, Inc.*, *supra*.

### D.  The Inference of Conspiracy

Plaintiff has alleged that the written Apple-Google revenue sharing agreement alleged in the SAC - the existence of which has been admitted by the Defendants – contains and *includes a specific agreement not to compete between Apple and Google*.  Once this document is revealed by Defendants and submitted to the trier of fact, the document itself, together with the testimony of two ranking Apple and Google executives, will prove the existence of the contract, combination and conspiracy at the heart of this case.  Plaintiff has alleged that this document contains the agreement not to compete between Apple and Google that constitutes

the violation of the Sherman Act, and Plaintiff's allegations must be taken as true for purposes of this motion.

But even if there were no written agreement, Plaintiff has made additional allegations that establish the combination and conspiracy requiring submission of the case to a jury.

The classic statement of combination or conspiracy in the context of a violation of the antitrust laws was clearly articulated by the Supreme Court in *American Tobacco Co. v. United States*, 328 U.S. 781, 808-10 (1946) in which the court stated:

> It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. . . No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words.  (Emphasis added.)

Plaintiff has alleged that Google has paid Apple exorbitant sums for the privilege of acting as the default on Apple's devices and that Google has agreed to share profits with Apple for that privilege.  Plaintiff has alleged that the Defendants have participated in numerous, sometimes clandestine, meetings.  (SAC, Paras. 18-26, 35-37, 79, 155-156, 181.) After and as a result of these meetings, Apple determined not to enter the search advertising business. (SAC, Para. 84.) A jury could infer, based upon this course of dealing and course of action, that Apple had agreed with Google not to go into the search advertising business in exchange for the payment of billions in Google advertising search revenue to Apple.

Since none of the other search engine competitors of Google could possibly match the payments that have been made to Apple and since the profit-sharing agreements between Apple and Google have in fact resulted in Apple pushing more search traffic to Google and

denying traffic to Google's competition, it is a logical and reasonable inference that these

payments and shared profits were paid by Google for the additional purpose of ensuring that

Apple would not compete with Google in the search advertising market since Google well

knew that Apple had been exploring the development of a search engine through its Siri

program and viewed Apple as a "Code Red" potential competitor. (SAC, Para. 43, 45-46.)

The inferences to be drawn from a defendant's opportunity to meet and its subsequent

conduct was illustrated in the case of *Esco Corporation v. United States*, 340 F.2d 1000 (9th

Cir. 1965).  There the Court emphasized the power of a "knowing wink":

> "From all this, says appellant's counsel, "there is a compelled inference" that
> Tubesales, the biggest competitor (who had pleaded nolo contendere to the charge of
> conspiracy) called the meeting "not to ask for agreement, but simply to announce" its
> own pricing plans. Were we triers of fact, we might well ask if this were so, what
> purpose was to be served by a meeting of competitors?
>
> "Nor are we so naive as to believe that a formal signed-and-sealed contract or
> written resolution would conceivably be adopted at a meeting of price-fixing
> conspirators in this day and age. In fact, the typical price-fixing agreement is usually
> accomplished in a contrary manner.
>
> "While particularly true of price-fixing conspiracies, it is well recognized law
> that any conspiracy can ordinarily only be proved by inferences drawn from relevant
> and competent circumstantial evidence, including the conduct of the defendants
> charged. . . A knowing wink can mean more than words. Let us suppose five
> competitors meet on several occasions, discuss their problems, and one finally states
> — "I won't fix prices with any of you, but here is what I am going to do — put the
> price of my gidget at X dollars; now you all do what you want." He then leaves the
> meeting. Competitor number two says — "I don't care whether number one does what
> he says he's going to do or not; nor do I care what the rest of you do, but I am going to
> price my gidget at X dollars." Number three makes a similar statement — "My price is
> X dollars." Number four says not one word. All leave and fix "their" prices at "X"
> dollars.
>
> "We do not say the foregoing illustration *compels* an inference in this case that
> the competitors' conduct constituted a price-fixing conspiracy, *including an agreement
> to so conspire,* but neither can we say, as a matter of law, that an inference of no
> agreement is compelled. As in so many other instances, it remains a question for the
> trier of fact to consider and determine what inference appeals to it (the jury) as most
> logical and persuasive, after it has heard all the evidence as to what these competitors
> had done before such meeting, and what actions they took thereafter, or what actions
> they did not take."  *Id*. at 1007.

The point that is made by the Ninth Circuit opinion in *Esco* is that the inference of conspiracy is a matter of common sense and therefore a question of fact for a jury that may not be foreclosed by the Court, either at the pleading stage or at summary judgement or at trial.

### E.  Google's Default Position on Apple Devices Gives Google an Anticompetitive Advantage Over its Competitors That is Supported by Apple

Google has argued that paying for the default position on Apple devices is not an anticompetitive act because the Google default can easily be changed to other search engines at the discretion of consumer/user.  The fact of the matter is, however, and Plaintiff has alleged, that users do not change the default search engine on the Apple devices once it has been set, or, if it is changed at all, it is changed only very infrequently.

At paragraph 182 of the SAC, Plaintiff has alleged that Tim Cook had actively promoted the profit-sharing arrangement from the very beginning in exchange for Apple's commitment not to compete in the search business and that Cook knew, as Google admitted in a 2018 strategy document drafted internally by Google, that "People are much less likely to change [the] default search engine on mobile."  As a result, the default position on Apple devices was a valuable asset to Google that it jealously sought to protect.

Google's argument that the significance of the default position should be ignored is contrary to law.  *Northern Pacific R. Co. v. United States*, 356 U.S. 1 (1958) was a tying case in which the government alleged that the railroads had inserted "preferential routing" clauses in their contracts for the sale or lease of land adjacent to their tracks which compelled the grantee or lessee to ship the commodities produced on the land over the defendant's railroad. The Supreme Court decided on summary judgment in favor of the government that these "preferential routing" clauses constituted anticompetitive contracts in violation of the antitrust laws. The railroad had argued that its "preferential routing" clause, like the default clause in

this case, was not anticompetitive since there were alternative means for the landowner to ship over competing carriers if the landowner met certain conditions.  This argument was roundly rejected by the Court which held as follows:

> The defendant contends that its "preferential routing" clauses are subject to so many exceptions and have been administered so leniently that they do not significantly restrain competition. . . . Of course if these restrictive provisions are merely harmless sieves with no tendency to restrain competition, as the defendant's argument seems to imply, it is hard to understand why it has expended so much effort in obtaining them in vast numbers and upholding their validity, or how they are of any benefit to anyone, even the defendant. *But however that may be, the essential fact remains that these agreements . . . deny defendant's competitors access to the fenced-off market on the same terms as the defendant*.  *Id*. at 11-12 (emphasis added).

The same is true in this case, and Defendants' arrangement to provide Google with the default position on devices that they know will not likely be modified by the user is likewise an anticompetitive act that violates the Sherman Act.

The agreement to provide Google with the coveted default search position also amounts to the anticompetitive foreclosure of a significant market.  Google and Apple have in effect foreclosed Google's competitors from the internet search market to the detriment of competition as a whole, and to the detriment of Google's competitors and customers and users in particular.  This principle was highlighted in *International Salt Co. v. United States*, 332 U.S. 392, 396 (1947), in which the Supreme Court ruled, while upholding the grant of summary judgment in favor of the government, that it was "unreasonable, *per se,* to foreclose competitors from any substantial market. [citing] *Fashion Originators Guild v. Federal Trade Commission,* 114 F. 2d 80 [opinion of L. Hand], affirmed, 312 U.S. 457."

## II.        THE SECOND AMENDED COMPLAINT ALLEGES A CONSPIRACY TO MONOPOLIZE UNDER SECTION 2 OF THE SHERMAN ACT

Plaintiff has alleged that Defendants Apple and Google conspired to monopolize the markets for general search and search advertising.  The Courts in this circuit have required a

showing of (1) the requisite agreement, (2) an intent to monopolize, and (3) one or more acts in furtherance of the conspiracy. *Paladin Assocs., Inc. v. Montana Power, Co*., 328 F.3d 1145, 1158 (9th Cir. 2003). Plaintiff need not prove that Defendants succeeded in monopolizing these markets, only that they conspired and set out to do what they intended to do.  A conspiracy to monopolize violates § 2 even though monopoly power was never acquired. *American Tobacco Co. v. United States*, 328 U.S. 781, 789.

Plaintiff has met these pleading standards:

Agreement:  Apple has combined with Google to monopolize the search business and the search advertising business by specifically agreeing, as alleged, in written and oral contracts, including through revenue sharing agreements and pre-installation agreements, that Apple would not compete with Google in general search or in search advertising. The Courts have held that an agreement in violation of Section 1 of the Sherman Act can be the predicated agreement for the violation of Section 2 Conspiracy to Monopolize. 2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Paragraph 809 (3d ed. 2006). Plaintiff's allegations of agreements under the Section 1 claim therefore provide the necessary predicate for the conspiracy to monopolize claim.

Intent:  Plaintiff has alleged Google's intent to maintain Google as the exclusive default search engine on Apple devices so as to exclude any potential competition, including competition from Apple, so that Google can maintain its monopoly.  Google's intent to monopolize has been manifest in statements by Google and Apple executives: "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo";  and their general counsel's description of their relationship as "coopetition."(SAC,Paras153-154,231,238)

Acts in Furtherance of Monopoly.  Defendants have consummated agreements with Apple to exclude search competitors from access to Apple devices through its Revenue Sharing Agreement under which Google has paid Apple billions of dollars to maintain Google as the exclusive default search engine on Apple devices, to keep Apple and other competitors out of the search advertising market so that Google can maintain its monopoly.  (SAC ¶¶162-178).  Defendants' executives have participated in meetings to discuss their agreements.

Monopoly Power.  Although not a pre-requisite to a claim for conspiracy, Google has monopoly power in the search and search advertising markets.  In *United States v. Griffith*, 334 U.S. 100, at 107 (1948) the Supreme Court stated that:

> ". . . the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. *American Tobacco Co. v. United States, 328 U.S. 781, 809, 811, 814. It is indeed "unreasonable, per se, to foreclose competitors from any substantial market." International Salt Co. v. United States,* 332 U.S.392, 396. The anti-trust laws are as much violated by the prevention of competition as by its destruction. *United States v. Aluminum Co. of America, supra.* It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."  (Emphasis added.)

Plaintiff has alleged that Google, in concert with Apple, has the market power to exclude competition, and in fact has exercised that power through its agreements with Apple.  The SAC at ¶105, ¶109-110 alleges a multitude of facts that demonstrate Google's "overwhelming power".  Size is an earmark of monopoly power, and, as stated by Justice Cardozo speaking for the Court in *United States v. Swift & Co.,* 286 U.S. 106, 116 "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."

The SAC alleges that Google controlled 94% of the U.S. mobile search engine market and 82% of the U.S. computer search engine market in 2020.  (SAC, Paras. 129-130.)

Google's next closest competitor was Bing with only 2% of the mobile search market share and 12% of the computer search market.

The SAC also alleges that Google commanded 71% of the search advertising market in 2022.

These percentages of market share are greater than those that have been held by courts in the past to constitute monopoly.   In *United States v. Aluminum Company of America*, 148 F.2d 416 (2d Cir. 1945).

Google has misused its size in the past.  Google has been fined billions of dollars for having abused its size in the past and has recently been fined by the European Commission in the amount of 2.42 billion Euros for abusing its market dominance in search to provide an illegal advantage to other Google products.  The United States has charged that Google has engaged in monopolizing the market for software that links publishers and advertisers in order to manipulate advertising auctions. (SAC ¶105, as charged in *United States v. Google, LLC*, Case 1:23-cv-00108, ED Virginia.)  The SAC has alleged that Apple, Google's co-conspirator, has been found to have engaged in a per se conspiracy with book publishers to fix the price of eBooks. *United States v. Apple, Inc*., 791 F.3d 290 (2d Cir. 2015). (SAC ¶104).  Courts in the Ninth Circuit have found that such prior conspiracies are "plus factors" that support an inference of subsequent conspiracy, particularly when the prior conspiracy and the alleged subsequent conspiracy have factual overlap, as here.  *In re SRAM Antitrust Litig*., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008).

In Judge Gilliam's Order granting the motion to dismiss the First Amended Complaint, the Court noted that Plaintiff had not clearly and adequately defined the relevant markets in

issue and concluded that Plaintiff had not sufficiently distinguished between the "search market" and the "search advertising market".  (ECF 104.)

In the Second Amended Complaint, Plaintiff has rectified this deficiency.  Plaintiff has alleged that both "General Search" and "General Search Advertising" are relevant antitrust markets in the United States.

### A.    General Search Services is a Relevant Antitrust Market

Plaintiff has alleged that general search services in the United States is a relevant antitrust market.  General search services allow consumers to find responsive information on the internet by entering keyword queries in a search engine such as Google, Bing, or DuckDuckGo.  (SAC, Paras. 195-197.)  Plaintiff has alleged that Google held a 94% share of the U.S. mobile search market and 82% of the computer search market in 2020.  (SAC, Paras. 14-15, 47, 129.)

### B.    General Search Advertising is a Relevant Antitrust Market

Plaintiff has alleged that general search advertising in the United States is a relevant antitrust market. The search advertising market consists of all types of ads generated in response to online search queries, including general search text ads (offered by general search engines such as Google and Bing) and other, specialized search ads (offered by general search engines and specialized search providers such as Amazon, Expedia, or Yelp).  Search ads enable advertisers to target potential customers based on keywords entered by these users, at the exact moment users express interest in the topic of the queries.  (SAC, Paras. 199-202.)

Plaintiff has alleged that Google held a 71% share of the search advertising market in 2022.  (SAC, Para. 135.)

### C.    Anticompetitive Effect and Standing of Plaintiff

The two markets, search and search advertising, are inter-related; Google's dominance in the overall search market necessarily contributes to its dominance in the search advertising market.  By restricting competition in general search services, Google's and Apple's conduct has harmed consumers of search services by reducing the quality of the general search experience, by lessening choices in general search services, and by impeding innovation. (SAC, Para. 205.)

Google's and Apple's exclusionary conduct has also substantially foreclosed competition in the search advertising market and has harmed advertisers such as Plaintiff. By suppressing competition, Google has increased its ability to charge advertisers more than it could in a competitive market. The curtailment of competition in the search advertising market has also reduced the quality of the services that Google provides to its advertisers, such as Plaintiff.  (SAC, Para. 206.)

**D.    Antitrust Injury**

Here, Plaintiff's claim of antitrust injury is founded upon the fact that Plaintiff and the putative class have paid more to Google to place their ads on Google search than they would have paid in a competitive market. Plaintiff has alleged:

> 87. By reason of Google's dominant monopolistic position in the general search market and its resulting dominant and monopolistic position in the search advertising market, Google is able to charge monopolistic prices for its search advertising, Plaintiff and the putative class have paid more to Defendant Google to place their ads on Google's search engine than they would have paid in a competitive search advertising market within the United States, especially if Apple had entered the search business as it had originally intended and competed with Google in the search advertising business.  (SAC, Para. 87;  See also, SAC, Paras. 213, 178.)

1.    <u>The Overcharge Injury to Purchasers Is Direct.</u>  Google search advertising has no distribution chain with separate markets such as distributor and retailer. Plaintiff contracts directly with Google for search advertising and has paid overcharges for search advertising

directly to Google. Thus, Plaintiff and the class were consumers of the alleged violator's services and Plaintiffs were in the same market as Google in keeping with *Somers v. Apple, Inc*. 729 F.3d 953, 963 (9th Cir. 2013): "The injury must 'flow. . . from that which makes the conduct unlawful,' and 'the injured party [must] be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  In this case, Plaintiff and the class are direct consumers of this violator's services.

2.    <u>The Measure of Harm Is Not Speculative</u>.  Once the fact of damage has been shown, the burden shifts to the defendant to contest the amount of that damage. Plaintiffs are entitled to estimate the amount of their damages. *Story Parchment Co. v. Patterson Paper Parchment Co.*, 282 U.S. 555 (1931).  The wrongdoer is not entitled to complain that the damages cannot be measured with exactness and precision.  *Eastman Co. v. Southern Photo Co.,* 273 U. S. 359,  379; B*igelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946); *Reiter v. Sonotone*, 99 S. Ct. 2326 (1979).

3.    <u>The Purchase Overcharges Are Not Duplicative</u>.   Disgorgement to the general public of the amounts wrongfully paid by Google to Apple, which is the relief sought in the SAC at Paragraphs 276(c)-(f), is not duplicative of the overcharge relief sought by Plaintiff and the putative class.  Plaintiff and the class seek to have Defendants return the overcharge damages paid by Plaintiff and the class in the purchase of search advertising services under section 4 of the Clayton Act, and, separately, seek the disgorgement of amounts paid by Google to Apple under section 16 of the Clayton Act. (SAC ¶¶59-69, 276(c)-(f).)

Since the overcharge damages sought by Plaintiff and the class purchasers of Google advertising services are completely different from the amounts that Google has paid to Apple in unlawful revenue-sharing, there is no duplication, nor any risk of duplicative recovery.

4.     No Complexity in Apportioning Damages.  Since the overcharge damages are completely different from and do not overlap with the amounts that Google paid to Apple in unlawful revenue-sharing, there is no duplication, and no apportionment is involved.

The Plaintiffs therefore have alleged the requisite standing to bring this action.

## III.     PLAINTIFF'S STATE LAW ANTITRUST CLAIMS SHOULD NOT BE DISMISSED

Plaintiff alleges that Defendants violated California state law under both the Cartwright Act, *California Business and Professions Code § 16700,* and under the California Unfair Competition Law, *California Business and Professions Code § 17200*.  (SAC Paras. 241-274.)

 "[T]he Cartwright Act is broader in range and deeper in reach than the Sherman Act." *Cianci v. Super. Ct.*, 40 Cal. 3d 903, 920 (1985); *see also In re Cipro*, 61 Cal. 4th 116 (2015).  Typically, if a plaintiff is capable of maintaining a Sherman Act claim, the plaintiff is capable of maintaining a similar Cartwright Act claim.

The California Supreme Court has consistently recognized the sweeping nature of the UCL under section 17200, stating: "When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

The UCL, intended to be broader and more flexible than the Sherman Act, "permit[s] tribunals to enjoin on-going wrongful business conduct . . . [and] deal with the innumerable

new schemes which the fertility of man's invention would contrive." *Cel-Tech, supra*, at 181.

Expressly concluding that conduct may be actionable under the UCL even if it does not rise to

the level of an antitrust violation, the California Supreme Court found the UCL proscribes

conduct that "violates the policy or spirit" of the antitrust laws "or otherwise significantly

threatens or harms competition." *Id*. at 180–81, 187.

Here, Google's and Apple's course of conduct—paying off a major competitor to

block that rival from relevant markets—satisfies these criteria, and Plaintiff's pleading of a

section 17200 violation and the Cartwright Act is adequate to survive a motion to dismiss.

Plaintiff has stated viable claims with regard to the state antitrust laws; the UCL claims

authorize both the recovery of damages and the equitable relief of disgorgement.

## IV.   THE INDIVIDUAL DEFENDANTS SHOULD NOT BE DISMISSED

In *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940) the government sued

and obtained criminal convictions of sixteen corporations and 30 of the defendant executives

who had orchestrated the price-fixing conspiracy, including the vice-president and multiple

managers of Defendant Socony-Vacuum, each of whom was fined $1,000.  *Id*. at Ftnt. 1, 2.  In

this case Plaintiff has alleged that the Defendants' executives have played a major role and

have directly participated in meetings to initiate and implement the scheme to divide markets,

pool profits and exclude competition. (SAC, Paras. 18-26, 32-37, 79, 155-156, 181.) There is

no basis in this case therefore to dismiss the individuals from potential liability for their acts

and those of their corporations.  If it were otherwise, executives would be encouraged to

violate the antitrust laws knowing that they will be immune.

///

///

## V.    THE STATUTE OF LIMITATONS IS NOT A BAR TO ACTS  OCCURING PRIOR TO FOUR YEARS FROM FILING

Plaintiff has pled fraudulent concealment by Defendants at SAC, Paras. 271-274.

These allegations comport with the standards set forth in *Hexel Corp. Ineos Polymers Inc*.,

681 F.3d 1055, 1060 (9th Cir. 2012) and *Garrison v. Oracle Corp*., 159 F. Supp. 3d 1044,

1073 (N.D. Cal.2016) and therefore serve to extend the statute of limitations, pending proof of

the fraudulent acts, back to the initiation of the profit sharing agreements between Google and

Apple in 2005.

## VI.    DISGORGEMENT OF GOOGLE'S PAYMENTS TO APPLE IS AUTHORIZED BY SECTION 16 OF THE CLAYTON ACT

Plaintiff seeks to disgorge unjust profits that Defendants accrued by their scheme.

This falls squarely within this Court's inherent powers and is authorized by law. Among the

court's powers, "equity practice [has] long authorized courts to strip wrongdoers of their ill-

gotten gains." *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936, 1942 (2020)

("[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the

absence of a clear and valid legislative command"). There is no such legislative command or

statutory prohibition here.  In fact, scholarship agrees that disgorgement is authorized under

the law. Philip Areeda and Herbert Hovenkamp, two of the most distinguished antitrust

scholars, unequivocally state that "Equity relief may include . .  the disgorgement of

improperly attained gains."  2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An

Analysis of Antitrust Principles and Their Application*, Paragraph 325a (3d ed. 2006). See

also: *U.S. v. KeySpan Corp.* 763 F. Supp 2d 633 (SDNY 2011) (disgorgement was permitted

to be pled); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-4346 SL, 2011 WL

27900179, at *3-4 (N.D.Cal. July 12, 2011).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VII.     IF NECESSARY, LEAVE TO AMEND AND FOR DISCOVERY IS APPROPRIATE**

Should the Court be inclined grant Defendants' motion in whole or in part, leave to amend, as well as the opportunity for discovery, is appropriate.  In *Kendall v Visa U.S.A., Inc.*, 518 F.3d. 1042, 1046 (9th Cir. 2008), the District Court "allowed appellants to conduct discovery so that they would have the facts they needed to plead an antitrust complaint."  This result would conform with the well-recognized principle that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Agron, Inc., v. Lin*, 2004 WL 555377, at *5 (C.D. Cal. August 18, 2003).

## CONCLUSION

Defendant has suggested that, should the Court deny the motion to dismiss, the case against Apple should be stayed pending resolution of the Google arbitration.  This argument was previously made by Apple and rejected by Judge Gilliam in his Order "Granting Motion to Compel Arbitration and Denying Motion to Stay Pending Arbitration" dated August 12, 2022 (ECF 86.)  Based upon the factual allegations made in the SAC, in order for the Court to grant Defendants' Motion to Dismiss, the Court would necessarily be required to conclude, contrary to the Supreme Court opinions in *Citizens Publishing* and *Palmer*, that violations for agreements not to compete and agreements to divide markets and to pool profits and to exclude competition do not exist in the antitrust lexicon.  And it would have to conclude that there is no violation for conspiracy to monopolize in derogation of the Supreme Court decision in *American Tobacco Co. v. U. S.,* 328 U.S. 781, 801-810 (1946) and the Ninth Circuit's opinion in *Knutson v. Daily Review, Inc.* 548 F.2d 795 (9th Cir. 1976).

Discovery can be accomplished very quickly in this case - and without extensive

documentation.  Plaintiff therefore requests that it be afforded the opportunity to prove its

allegations, and that Defendants' Motion be denied in its entirety.

Dated:  July 28, 2023                          ALIOTO LAW FIRM

                                    By:  /Joseph M. Alioto/

                                          Joseph M. Alioto (SBN 42680)
                                          Tatiana V. Wallace (SBN 233939)
                                          One Sansome Street, Suite 3500
                                          San Francisco, CA  94104
                                          Telephone: (415) 434-8900
                                          Attorneys for Plaintiffs

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)          Robert J. Bonsignore (SBN
LAW OFFICES OF LAWRENCE G.              BONSIGNORE TRIAL LAWYERS, PLLC
PAPALE                                  23 Forest Street
1308 Main Street, Suite 117             Medford, MA 02155
St. Helena, CA 94574                    Phone: 781-856-7650
Telephone: (707) 963-1704               Email: rbonsignore@classactions.us
Email: lgpapale@papalelaw.com

Theresa Moore (SBN 99978)               Josephine Alioto (SNB 282989)
LAW OFFICE OF THERESA D. MOORE PC       THE VEEN FIRM
One Sansome Street, 35th Floor          20 Haight Street
San Francisco, CA 94104                 San Francisco CA 94102
Phone: (415) 613-1414                   Telephone: (415) 673-4800
tmoore@aliotolaw.com                    Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)        Lingel H. Winters, Esq. (SBN 37759)
NEDEAU LAW PC                           LAW OFFICES OF LINGEL H. WINTERS
154 Baker Street                        388 Market St. Suite 1300
San Francisco, CA 94117-2111            San Francisco, California 94111
Telephone: (415) 516-4010               Telephone: (415) 398-2941
Email: cnedeau@nedeaulaw.net            Email: sawmill2@aol.com

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

*Plaintiffs Opposition to Defendants' Motion to Dismiss Second Amended Complaint*